[No. H001578. Sixth Dist. May 21, 1986.]

BARNES-HIND, INC., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
ALLERGAN PHARMACEUTICALS, INC., Real Party in Interest.

**COUNSEL**

Richard P. Verlasky, Maureen E. Markey and Mulvaney & Kahan for Petitioner.

No appearance for Respondent.

Donald E. Sloan, David J. Shaffer, Nancy D. Martindale and Gibson, Dunn & Crutcher for Real Party in Interest.

**OPINION**

**BRAUER, J.**—Barnes-Hind, Inc. (Barnes-Hind) and Allergan Pharmaceuticals, Inc. (Allergan) are competitive manufacturers of contact lens solutions. Allergan sued Barnes-Hind, complaining of certain of Barnes-Hind's advertisements and direct communications to doctors and users. One of Allergan's theories, most recently embodied in the fourth count of its second amended complaint, is that Barnes-Hind's publications amounted to libel per se. Respondent superior court overruled Barnes-Hind's demurrer

to the second amended complaint; Barnes-Hind seeks pretrial review. In a technical sense, respondent court's order is probably correct: In its fourth count Allergan has pleaded facts arguably sufficient to constitute a claim on a theory of libel *per quod*, and thus sufficient to show that it may be entitled to some relief. But it is clear from the proceedings both here and in respondent court that the real issue is whether Allergan can plead libel per se. We conclude that it cannot. A writ of mandate will issue.

From the second amended complaint it appears that Allergan manufactures (among other products) a contact lens solution called "Soflens" which contains an enzyme to remove protein deposits, while Barnes-Hind manufactures both contact lenses (including a model called Hydrocurve II, allegedly one of the types that Soflens is designed to clean) and lens solutions (including a nonenzyme cleaning solution for Hydrocurve II and similar lenses).

Allergan complains of a series of written advertisements and direct communications to "eye care professionals" by Barnes-Hind. Copies of the publications are attached to Allergan's first and second amended complaints. Fairly summarized, the general gist of the publications is that enzyme cleaners should not be used with Hydrocurve II and similar extended-wear contact lenses because the enzyme cleaners tend to cause irritation and do not get the lenses clean. Allergan alleges that Barnes-Hind has refused to provide data to substantiate these publications, that the publications are in fact false and are intended to harm Allergan's business, and that Barnes-Hind threatens to continue along the same line.

Allergan sued for injunctive relief and damages on four theories: unfair competition, interference with prospective economic advantage, trade libel, and libel per se. The first three theories are theoretically related: ■ Trade libel is generally distinguished from common law defamation and is said to connote "'an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff.' (*Erlich* v. *Etner* (1964) 224 Cal.App.2d 69, 73 . . .) . . . ." (*Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 548 [216 Cal.Rptr. 252]; cf. 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 330, pp. 2596-2597.) Libel per se, on the other hand, is based in common law defamation, and thus relates to the standing and reputation of the businessman as distinct from the quality of his or her goods. (Cf. *Rosenberg* v. *J. C. Penney Co.* (1939) 30 Cal.App.2d 609, 619-622 [86 P.2d 696].) A corporation can be libeled by statements which injure its business reputation. (*Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) 215 Cal.App.2d 560, 570-571 [30 Cal.Rptr. 350]; cf. *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763, 770 [160 Cal.Rptr. 97, 603 P.2d 14].)

Libel per se is distinguished from libel *per quod* in Civil Code section 45a (cf. *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 153-154 [185 Cal.Rptr. 244, 649 P.2d 886]): "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code." The definition: "'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other." (Civ. Code, § 48a, subd. 4(b).)

■ The tactical significance of Allergan's libel per se theory is obvious: If Allergan can plead and prove libel per se it need not prove special damages: "[D]amage to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages" including, in an appropriate case, punitive damages. (*Contento* v. *Mitchell* (1972) 28 Cal.App.3d 356, 358 [104 Cal.Rptr. 591].) On the facts pleaded Barnes-Hind's potential exposure would be substantial; the prospects of a successful appeal and of need for a second trial must be taken into account. In these circumstances it is appropriate to review respondent court's ruling in pretrial writ proceedings. (Cf. *Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].)

Barnes-Hind attacked Allergan's libel per se theory by successive demurrers (cf. *Polygram Records, Inc.* v. *Superior Court, supra,* 170 Cal.App.3d 543, 551). The first demurrer was to Allergan's first amended complaint, which by its fourth count added to the allegations summarized above only the following:

"29. Barnes-Hind issued, published, distributed and circulated said disparaging statements [in the publications, copies of which were attached to the pleading] to third parties, including present and prospective users of Allergan's Soflens Enzymatic Contact Lens Cleaner product.

". . . . . . . . . . . . . . . . . . . . . . . .

"34. The publications alleged in paragraph 29 were made of and concerning the plaintiff and were so understood by those who read the publications.

"35. Barnes-Hind's false statements and conduct as described . . . above, constitute libel per se within the meaning of Cal. Civ. Code §§ 45, 45a in

that they, among other things, directly and/or indirectly imply dishonesty or immorality in Allergan's conduct of its business.

"36. In making the statements . . . and engaging in the conduct described . . ., Barnes-Hind acted with malice, oppression and conscious disregard of Allergan's rights and with knowledge that the statements were false and/or with reckless disregard for their truth or falsity.

"37. By reason of said libel, Allergan has suffered damages for decline of business, loss of goodwill, and injury to business reputation."

Respondent court sustained Barnes-Hind's demurrer with leave to amend, concluding that Allergan had stated a cause of action for trade libel but not for libel per se. We infer, and would concur in, a conclusion that the attached copies of allegedly libelous publications were insufficient, in and of themselves, to establish libel per se.

Allergan did not seek review of respondent court's ruling. Instead it filed a second amended complaint, attaching copies of the same publications but deleting the conclusionary allegation that the publications "among other things, directly and/or indirectly imply dishonesty or immorality in Allergan's conduct of its business" and adding the following allegations:

"All of the publications disparaged the effectiveness and safety of enzyme cleaners. From 1975 until early 1983, Allergan was the only manufacturer of enzyme cleaners in the United States. Allergan sold 87% of the enzyme cleaners in the U.S. in 1983 and 78% in 1984. Plaintiff is informed and believes, and thereon alleges that representatives of Barnes-Hind made statements substantially similar to the statements described . . . above, that disparaged Allergan's product by name. [¶] . . . The publications alleged . . . were made almost exclusively to eye care practitioners, i.e., opticians, optometrists, and opthamologists [sic], who are fully and completely aware of the composition of the United States market for enzyme cleaners and the sellers thereof. [¶] . . . Barnes-Hind's false statements and conduct, as described . . . above, explicitly and implicitly constitute an attack on plaintiff's corporate reputation. These false statements demean plaintiff's competence as a manufacturer of contact lens cleaners, claiming as they do, that plaintiff's product is ineffective in removing soilants from contact lenses. . . . These false statements also disparage plaintiff's integrity as a manufacturer of contact lens cleaners in that they impute to plaintiff a callous disregard for the welfare of the consumer, as plaintiff is alleged to manufacture and market a product which thousands of people have reported to cause moderate to severe eye irritation. . . . Barnes-Hind's false statements were intended to, do, and have been interpreted by their receivers as,

implying dishonesty by Allergan in the conduct of its business affairs. [¶] . . . The nature of the over-the-counter drug industry and market is such that a manufacturer must represent and support the safety and efficacy of its product to the Food and Drug Administration ('FDA') as a condition of getting FDA approval to market the product. These requirements are known to the professionals described in paragraph 35 above, to whom defendant disparaged plaintiffs' [*sic*] product. By making statements to these professionals that plaintiffs' [*sic*] product is neither safe nor efficacious, defendant is directly implying that plaintiff misrepresented these facts to the FDA and to the public in seeking marketing approval and in marketing the product. [¶] . . . Barnes-Hind's false publications concerning enzyme cleaners were made without reasonable grounds for believing their truth. Further, these statements were made for a reason other th[a]n to protect the interest of the eye care practitioner to whom the statements were made, in that the publications were made expressly for the purpose of persuading eye care practitioners to use and recommend for use Barnes-Hind's product rather than plaintiff's product."

Barnes-Hind again demurred. This time the demurrer was overruled without comment. This writ petition followed.

■ To survive a general demurrer, "'plaintiff need only plead facts showing that he may be entitled to some relief [citation].' [Citation.]" (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032]; cf. also Code Civ. Proc., § 452; *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 825 [106 Cal.Rptr. 718].) ■ The allegations of the fourth count are probably sufficient for pleading purposes to describe a libel *per quod*. (Cf. *Slaughter* v. *Friedman, supra,* 32 Cal.3d 149, 153-155; *Cameron* v. *Wernick* (1967) 251 Cal.App.2d 890, 892-894 [60 Cal.Rptr. 102].) Allergan alleges that "[b]y reason of said libel, Allergan has suffered damages for decline of business, loss of goodwill, and injury to business reputation." Under the liberal rules applicable to demurrer this might be deemed a sufficient allegation of special damage. (Cf. *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 548 [343 P.2d 36]; but cf. *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 807 [163 Cal.Rptr. 628, 608 P.2d 716].)

But patently the real issue is whether Allergan has sufficiently alleged a libel per se. Barnes-Hind argues (1) that the publications copied in the complaint are not libelous on their face, and (2) that the extrinsic matters alleged in the fourth count cannot, under the section 45a definition, convert publications not libelous on their face into libel per se.

■ "[L]anguage may be libelous on its face even though it may also be susceptible of an innocent interpretation. The test is whether a defamatory

meaning appears from the language itself without the necessity of explanation or the pleading of extrinsic facts. If it does, 'whether the charge be directly made or merely implied, the publication—without *averment, colloquium,* or *innuendo*—will, in itself, constitute a libel." (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 549; cf. generally, 4 Witkin, Summary of Cal. Law, *op. cit. supra,* Torts, §§ 280-287, pp. 2549-2559.) Perhaps the clearest example of libel per se is an accusation of crime. ■ The courts have manifested liberality, at the pleading stage, in finding libel per se. Thus it has been said to be "error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning." (*Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1131 [212 Cal.Rptr. 838]; cf. *Cameron* v. *Wernick, supra,* 251 Cal.App.2d 890, 893.)

■ It is possible to commit libel per se in the course of business competition. ■ *Rosenberg* v. *J. C. Penney Co., supra,* 30 Cal.App.2d 609, succinctly states the distinction between defamatory libel and what is now called trade libel: "There are two classes of statements concerning the goods of a competitor, first, where the statement is made with reference to goods or products, but there is also included libelous words concerning the seller, which impute to him, in connection with the sale of such goods, fraud, dishonesty or questionable business methods; and, secondly, statements that go no further than to criticise the goods of a competitor, which criticism is based upon or appeals to a personal taste or preference of the buyer, but contains no imputation against the honesty or integrity of the merchant in the sale of the goods." (*Id.,* at p. 621.) In *Rosenberg* the competitive article was gym shorts, and the defendant retailer, in a window display, compared its shorts with those of the plaintiff, a locally-owned competitor. In the display, among several forthright aspersions upon the quality of the competitor's goods ("seems crooked," "slovenly made," "shoddy appearance," and so on), were statements that "These shorts were the Official Uniform of the Healdsburg High School to be purchased exclusively from [the local competitor]," that "This Garment is either a poorly made second or prison-made merchandise," and that the competitor had sold as preshrunk garments which were not. The Court of Appeal agreed with the trial court that in the circumstances of record (which included photographs of the display) the defendant had accused the plaintiff of "fraud and deception and unfair dealing with their customers," and that the publication was libelous per se. (*Id.,* at pp. 619-620.)

Allergan asserts that *Rosenberg* is "logically indistinguishable from the case at hand." We find no compelling similarity. Whether or not actionable as trade libel or on some other unfair-competition theory, Barnes-Hind's publications in and of themselves have no apparent tendency, under any

reasonable interpretation, to impute to Allergan "in connection with the sale of such goods, fraud, dishonesty or questionable business methods" or otherwise to defame Allergan.

Can Allergan's fourth count be saved by the allegations newly added to it? Allergan argues that *all the circumstances* of the publication must be considered, and that its new allegations simply make known to the court circumstances which were already known to those to whom the publications were made. According to Allergan, "[t]he definition of libel *per se* in Section 45a is not meant to preclude the alleging of explanatory information to the *court,* but only prohibits the pleading of information outside the publication to render the publication libelous to the *reader* or hearer. In other words, if the reader requires a lengthy recitation of background information or context, then the statements are not defamatory *per se.*" Allergan argues that under the allegations of the complaint the publication was made to a limited class of readers who "understood, without explanatory matter, their defamatory character."

The abstract proposition on which Allergan relies—that the words of an alleged libel per se must be considered "according to the sense and meaning under all the circumstances attending the publication which such language may fairly be presumed to have conveyed to those to whom it was published" (see, e.g., *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546-547, and *Selleck* v. *Globe International, Inc., supra,* 166 Cal.App.3d 1123, 1132) is attributable to decisions which discussed libel generally, without direct consideration of the effect of the proposition upon the distinction between libel per se and libel *per quod.* (*Bettner* v. *Holt* (1886) 70 Cal. 270, 274 [11 P. 713]; cf. also *Stevens* v. *Storke* (1923) 191 Cal. 329, 334 [216 P. 371]; *Schomberg* v. *Walker* (1901) 132 Cal. 224, 227-228 [64 P. 290].)

We cannot accept Allergan's proposed distinction between the reader of a libel and the court which hears the subsequent action for damages.

The definition of libel—a false and unprivileged publication "which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation" (Civ. Code, § 45)—assumes that the reader of a libel will recognize it as such. ▮ If no reasonable reader would perceive in a false and unprivileged publication a meaning which tended to injure the subject's reputation in any of the enumerated respects, then there is no libel at all. If such a reader would perceive a defamatory meaning without extrinsic aid beyond his or her own intelligence and common sense, then (under section 45a and the cases, such as *MacLeod,* which have construed it) there is a

libel per se. But if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then (under the same authorities) the libel cannot be libel per se but will be libel *per quod*.

■  To plead and prove any libel, the plaintiff of course must state facts sufficient to make the defamatory meaning apparent to the triers of law and fact. If there is a libel per se, it should be unnecessary to plead extrinsic . facts; the defamation should be as apparent to the court as to the reader. But in the case of a libel *per quod* the plaintiff cannot assume that the court has access to the reader's special knowledge of extrinsic facts and must specially plead and prove those facts.

These propositions are implicit in the decisions and commentary, although usually in the context of the court proceeding rather than out of the antecedent publication. "The purpose of the rule requiring proof of special damages when the defamatory meaning does not appear on the face of the language used is to protect publishers who make statements innocent in themselves that are defamatory only because of extrinsic facts *known to the reader*." (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 550, italics added.)  ■   In the libel context, "inducement" and "innuendo" are terms of art: "[W]here the language is ambiguous and an explanation is necessary to establish the defamatory meaning, the pleader must do two things: (1) Allege his interpretation of the defamatory meaning of the language (the 'innuendo,' . . .); (2) support that interpretation by alleging *facts* showing that the readers or hearers to whom it was published would understand it in that defamatory sense (the 'inducement')." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 690, pp. 141-142.) "The office of an innuendo is to declare what the words *meant* to those to whom they were published." (*Washer* v. *Bank of America* (1943) 21 Cal.2d 822, 828 [136 P.2d 297, 155 A.L.R. 1338], italics added [limited by *MacLeod* in respect not relevant here]; cf. also Rest.2d Torts, § 563, com. f; Prosser & Keeton, Torts (5th ed. 1984) § 111, p. 782.) "In order to plead . . . ambiguous language into an actionable libel . . . it is incumbent upon the plaintiff also to plead an inducement, that is to say, circumstances which would indicate that the words *were understood* in a defamatory sense showing *that the situation or opinion of the readers was such that they derived a defamatory meaning* from them. [Citation.]" (*Peabody* v. *Barham* (1942) 52 Cal.App.2d 581, 585 [126 P.2d 668], italics added [limited by *MacLeod* in respect not relevant here]; cf. also Rest.2d Torts, *supra,* Prosser & Keeton, Torts, *supra.*)

■  The allegations of the fourth count of the second amended complaint are classic examples of innuendo and inducement. Allergan concedes that

these allegations were necessary to make apparent to respondent court the alleged libel. It follows, and Allergan also concedes, that knowledge of the extrinsic facts alleged was necessary to make the asserted libel apparent to its readers. This cannot be libel per se.

The procedural requirements for a peremptory writ in the first instance have been met. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-183 [203 Cal.Rptr. 626, 681 P.2d 893].)

Let a peremptory writ of mandate issue directing respondent Santa Clara County Superior Court to modify its "order overruling demurrer" filed January 22, 1986, in action No. 565589, Allergan Pharmaceuticals, Inc. v. Barnes-Hind, Inc. et al., by striking the second paragraph thereof and substituting the following new second paragraph: "IT IS HEREBY ORDERED that as to so much of the Fourth Cause of Action of Plaintiff's Second Amended Complaint as purports to plead a claim for a libel on its face as defined in Civil Code section 45a, defendant's demurrer is sustained without leave to amend. The demurrer is otherwise overruled. Moving Party BARNES-HIND, INC., will have ten days within which to answer the Complaint." The stay of proceedings heretofore ordered herein will be dissolved upon issuance of the peremptory writ.

Agliano, P. J., and Chang, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.