Filed 11/2/17; pub. order 12/1/17 (see end of opn.)6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOYCE BARTHOLOMEW, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> YOUTUBE, LLC., <br><br> Defendant and Respondent. | H042775 <br> (Santa Clara County <br> Super. Ct. No. 1-15-CV275833) |

**INTRODUCTION**

We are asked in this case to decide whether a musician stated a claim for libel *per quod* against the popular video viewing Web site, YouTube. When YouTube decided to block access to Joyce Bartholomew's video, it posted a statement that the video had violated YouTube's terms of service, a statement which also provided a hyperlink to a list of examples and tips, a list YouTube called its "Community Guideline Tips." In her complaint, Bartholomew alleged that both the statement notifying users that her video had been taken down and the Community Guideline Tips subsection harmed her reputation. The trial court sustained YouTube's demurrer to the sole cause of action, libel *per quod*, without leave to amend. Bartholomew appeals. For the reasons stated below, we agree with the trial court that Bartholomew has not stated a claim and will therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Joyce Bartholomew (Bartholomew) lives in Naples, Florida. She is a musician who creates and publishes what she calls "original Christian ministry music." Around August 2011, Bartholomew became a volunteer national spokesperson and the "opening act" for concerts involving an organization called, Mission: PreBorn. At some time not indicated in her pleadings, Bartholomew wrote a song called "What Was Your Name," a "Christian and pro-life song" (the song). In 2013, she produced a video for the song, which she claims was of "high quality and likely to be well received by her listeners and viewers" (the video).

That same year, Bartholomew created an account with YouTube, LLC (YouTube) and agreed to be bound by its terms of service. On January 14, 2014, Bartholomew uploaded the video for the song to her YouTube account. YouTube assigned a uniform resource locator (URL) for the video so that it could be viewed on the internet. Bartholomew began sharing the URL with her listeners, viewers, and other members of the public by "word of mouth and on social media websites." By the end of April 2014, she claims, the video had been viewed over 30,000 times.

At some point near the end of April 2014, however, YouTube "removed the Video."[1] The URL for the Bartholomew's original video was not itself deactivated— instead, the URL opened an internet page with "the image of a distressed face and the following written statement. . . . 'This video has been removed because its content violated YouTube's Terms of Service.' " (For ease of reference, we will refer to this sentence posted by YouTube as the "removal statement.")

---

[1] YouTube asserts that Bartholomew's video was not removed entirely but was simply moved from its original URL to a new location where its view count was reset. This does not appear in Bartholomew's pleading, but it is irrelevant for the purposes of our analysis.

The screen with the removal statement did not explain or provide any details as to how or why the video violated YouTube's terms of service. It also did not refer to Bartholomew by name. The removal statement, however, did provide a hyperlink. That link would lead readers to a new internet page entitled "Community Guideline Tips." That page reads: "Want a little more insight into the limits and exceptions in the Community Guidelines? Here are some helpful examples and tips." Then follows a list, arranged in column format, of 10 categories: "Sex and Nudity," "Hate Speech," Shocking and Disgusting," Dangerous Illegal Acts," "Children," Copyright," "Privacy," "Harassment," "Impersonation," and "Threats."[2] Each of these categories in turn has a hyperlink which provides readers with "further elaboration" about each category. (Because the content of these categories is germane to our analysis, they are set forth in full in a footnote below.)[3]

---

[2] The Community Guideline Tips are attached to Bartholomew's first amended complaint as an exhibit in what appears to be an image of what the viewer would see displayed on a computer, a screenshot. Although the complaint does not say it, the parties seem to agree that the Community Guideline Tips constitutes the lower portion of a longer internet page called "YouTube Community Guidelines," which are also incorporated into YouTube's terms of service.

[3] "Sex and Nudity: Most nudity is not allowed, particularly if it is in a sexual context. Generally if a video is intended to be sexually provocative, it is less likely to be acceptable for YouTube. There are exceptions for some educational, documentary, scientific, and artistic content, but only if that is the sole purpose of the video and it is not gratuitously graphic. For example, a documentary on breast cancer would be appropriate, but posting clips out of context from the documentary might not be.

"Hate Speech: 'Hate Speech' refers to content that incites hatred against members of a protected group. For instance, racist or sexist content may be considered hate speech. Sometimes there is a fine line between what is and what is not considered hate speech. For instance, it is generally okay to criticize a nation, but not okay to incite hatred or violence against people of a particular nationality.

"Shocking and Disgusting: The world is a dangerous place. Sometimes people do get hurt and it's inevitable that these events may be documented on YouTube. However, it's not okay to post violent or gory content that's primarily intended to be shocking, sensational or disrespectful. If a video is particularly graphic or disturbing, it should be

balanced with additional context and information.  For instance, including a clip from a slaughter house in a video on factory farming may be appropriate.  However, stringing together unrelated and gruesome clips of animals being slaughtered in a video may be considered gratuitous if its purpose is to shock rather than illustrate.

"Dangerous Illegal Acts:  While it might not seem fair to say you can't show something because of what viewers theoretically might do in response, we draw the line at content that's intended to incite violence or encourage dangerous, illegal activities that have an inherent risk of serious physical harm or death.  This means not posting videos on things like instructional bomb making, ninja assassin training, sniper attacks, videos that train terrorists, or tips on illegal street racing.  Any depictions like these should be educational or documentary and shouldn't be designed to help or encourage others to imitate them.

"Children:  Videos involving children (anyone under the age of 18) are particularly sensitive.  Videos containing children should never be sexually suggestive or violent.  Please be cautious when posting something involving a child. If you're sharing a private moment or home movie, consider making it a private video so that only your family and friends can see it.

"Copyright:  When you create something original, you own the copyright for it.  Likewise, when other people create content, they may have a copyright to it.  As a creative community, it's essential that everyone on  YouTube respect the copyrights of others.  If you're not sure if something will violate someone's copyright, the safest thing to do is to create something completely original, with images and audio you've created. If it's all yours you never have to worry about copyright—you own it.  If you've recorded something from a DVD, videotaped your TV screen, or downloaded a video online, don't post it unless you have permission.

"Privacy:  If a video you've recorded features people who are readily identifiable and who haven't consented to being filmed, there's a chance they'll file a privacy complaint seeking its removal.  We'll notify you if that happens and give you a chance to edit and re-upload your video before we act on the complaint.  If we do remove your video for privacy reasons, don't upload another version featuring the same people.  Chances are those people will file another privacy complaint or report you for harassment.  Don't post other people's personal information, including phone numbers, addresses, credit card numbers, and government IDs.  We're serious about keeping our users safe and suspend accounts that violate people's privacy.

"Harassment:  It comes down to respect.  YouTube is all about sharing and interacting with the community in respectful ways.  If you're not sure whether a video or comment you've made crosses the line, follow a simple rule of thumb: if you wouldn't say it to someone's face, don't say it on YouTube.  And if you're looking to attack, harass, demean, or impersonate others, go elsewhere.

Impersonation:  Impersonating another user by copying someone's exact channel layout, using a similar username, or posing as that person in comments, emails or videos

Although the pleadings are not entirely explicit on this point, it seems that these further details regarding each category apparently could be accessed by a viewer's clicking on each category on the Community Guideline Tips page—they may have also been available already expanded on the full "YouTube Community Guidelines" page (the pleadings are not clear on this subject).

Bartholomew's counsel contacted YouTube by e-mail on June 18, 2014 and asked that the video be restored to the site and that the notice of violation be removed. Two days later, on June 20, YouTube responded that the removal was justified because Bartholomew's account had run afoul of Paragraph 4(H) of YouTube's terms of service, which bans the use of automated systems (such as "robots," "spiders," and "offline readers") which "send[] more request messages to the YouTube servers in a given period of time [than] a human can reasonably produce in the same period by using a conventional on-line Web browser."

Bartholomew's counsel then asked YouTube to provide evidence of such a violation. YouTube responded by writing that "[a]ny information regarding our users is subject to relevant laws protecting individual privacy. In accordance with these laws, YouTube will only provide information pursuant to appropriate legal process."

Bartholomew then filed a complaint against YouTube purporting to state one cause of action, libel per se. She claimed that not only did she not violate the terms of service, making the removal statement false, but that, even if it were true, this did not concern the "content" of the video as the removal statement indicated. She also claimed that YouTube published statements that were libel per se because they imputed to her a "want of character," a violation of the terms of service, and the creation and posting of

is considered harassment. If you want to keep your account, stay away from participating in any form of impersonation or harassing activity on the site.

"Threats: Users shouldn't feel threatened when they're on YouTube. Period. Don't leave threatening comments on other people's videos."

5

videos which "concern sex and nudity, hate speech, shocking and disgusting acts, dangerous illegal acts, inappropriate use of children, copyright infringement, privacy violations, harassment, impersonation, and/or threats."

In response to a demurrer by YouTube, the trial court found that Bartholomew had alleged that the removal statement itself (the simple statement that the video has been removed) was false but that it was not defamatory on its face (as required for libel per se) because it did not mention her in any way and contained nothing that would subject Bartholomew to hatred, contempt, or the like. The trial court also held that the Community Guideline Tips page constituted "extrinsic facts and innuendo," which were necessary to understand any defamatory meaning. The court also held that assuming, *arguendo*, that the Community Guideline Tips were not considered extrinsic explanatory matter, they still did not defame Bartholomew because "a reasonable reader would not infer . . . that the [v]ideo contained the specific kinds of improper content mentioned" because the categories listed are described as "*examples*" to provide readers with further insight. The court sustained the demurrer with leave to amend.

Bartholomew filed an amended complaint, this time stating a single cause of action of libel *per quod*. Besides the addition of allegations relating to what Bartholomew claims were special damages, the amended complaint was materially the same as the initial pleading. Again, she alleged that YouTube had published public writings that were libelous because they imputed a want of character, that she violated YouTube's terms of service, that she created and posted videos that violated the terms of service in ways which "reflect[ed] adversely on [Bartholomew's ] character because they all refer to such" conduct as sex, nudity, etc.

YouTube once again filed a demurrer. This time, the trial court sustained it without leave to amend. It found that the removal statement was not "libelous whether or not it is interpreted in light of the 'Community Guideline Tips.' The [s]tatement refers to

6

a violation of YouTube's Terms of Service, not its Community Guidelines, and the 'Community Guideline Tips' merely displays an exemplary list of issues, none of which are suggested to relate to [Bartholomew.] Furthermore, while accusations of a violation relating to some categories (e.g. 'Sex and Nudity,' 'Hate Speech') could be deemed libelous in the context of [Bartholomew's] career, other categories (e.g. 'Children,' 'Copyright,' 'Privacy,') do not necessarily evoke offensive conduct. Given these circumstances, the [s]tatement and 'Community Guideline Tips' simply do not impute any offensive conduct to [Bartholomew]. [Bartholomew] relied upon this same material in her original complaint, and does not contend that any new extrinsic material bearing on the meaning of the [s]tatement could be included in a further amended complaint." This order was signed on August 5, 2015. A notice of appeal was filed on September 14, 2015.

## DISCUSSION

Bartholomew's main argument on appeal is that the trial court was incorrect in its conclusion that the Community Guideline Tips were not defamatory because they contained only examples of offensive conduct and that some of them do not even evoke offensive conduct to begin with. She also argues that YouTube's one-sentence removal statement was defamatory even without regard to the Community Guideline Tips. Because we reject both of these arguments, which are dispositive of her claim for libel *per quod,* we need not address additional issues raised by Bartholomew, such as whether she adequately alleged special damages.

### I.     *Standard of Review*

"In determining whether plaintiff has properly stated a claim for relief, our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.]

7

Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [citations]." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)[4]

## II.     *General Background Regarding The Law Of Libel*

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)[5] There are generally two types of libel recognized in California—libel per se and libel *per quod.* "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves

---

[4] The record contains no order of dismissal, only an order sustaining YouTube's demurrer to Bartholomew's first amended complaint without leave to amend. In view of our resolution of the issues as explained below, we shall order the trial court to enter, nunc pro tunc as of August 5, 2015, the date of the order sustaining YouTube's demurrer without leave to amend, an order of dismissal (Code Civ. Proc., § 581d), and we construe the notice of appeal to refer to that order. (See *Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Property Casualty Co. of America* (2011) 197 Cal.App.4th 424, 426.)

[5] All statutory references herein are to the Civil Code unless otherwise stated.

8

that he has suffered special damage as a proximate result thereof." (§ 45a.; see also *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547-548 (*MacLeod*).)[6]

The distinction has been described as follows: "If no reasonable reader would perceive in a false and unprivileged publication a meaning which tended to injure the subject's reputation in any of the enumerated respects, then there is no libel at all. If such a reader would perceive a defamatory meaning without extrinsic aid beyond his or her own intelligence and common sense, then (under section 45a and the cases, such as *MacLeod*, which have construed it) there is a libel per se. But if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then (under the same authorities) the libel cannot be libel per se but will be libel *per quod*." (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 386-387 (*Barnes-Hind*).)

"The purpose of the rule requiring proof of special damages when the defamatory meaning does not appear on the face of the language used is to protect publishers who make statements innocent in themselves that are defamatory only because of extrinsic facts known to the reader." (*MacLeod, supra,* 52 Cal.2d at p. 550.) "In the libel context, 'inducement' and 'innuendo' are terms of art: '[Where] the language is ambiguous and an explanation is necessary to establish the defamatory meaning, the pleader must do two things: (1) Allege his interpretation of the defamatory meaning of the language (the "innuendo"); (2) support that interpretation by alleging *facts* showing that the readers or hearers to whom it was published would understand it in that defamatory sense (the

---

[6] " 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession, or occupation, including such amounts as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other." (§ 48a, subd. (d)(2).)

"inducement").' [Citation.] 'The office of an innuendo is to declare what the words *meant* to those to whom they were published.' (*Washer v. Bank of America* (1943) 21 Cal.2d 822, 828 [citations], italics added [limited by *MacLeod* in respect not relevant here]; [citation].) 'In order to plead . . . ambiguous language into an actionable libel . . . it is incumbent upon the plaintiff also to plead an inducement, that is to say, circumstances which would indicate that the words *were understood* in a defamatory sense *showing that the situation or opinion of the readers was such that they derived a defamatory meaning* from them. [Citation.]' (*Peabody v. Barham* (1942) 52 Cal.App.2d 581, 585 [citation], italics added [limited by *MacLeod* in respect not relevant here]; [citation].)" (*Barnes-Hind*, *supra,* 181 Cal.App.3d at p. 387.)

" ' "[I]n passing upon the sufficiency of such language as stating a cause of action, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction." That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader. A defendant is liable for what is insinuated, as well as for what is stated explicitly. [Citation.]' [Citation]." (*MacLeod, supra,* 52 Cal.2d at p. 547.)

Further, "[t]he publication in question may not be divided into segments and each portion treated as a separate unit; it must be read as a whole in order to understand its import and the effect that it was calculated to have on the reader, and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning that may be fairly presumed to have been conveyed to those who read it. [Citation.] Headlines and captions of an allegedly libelous article are regarded as a part of the article." [Citation].) (*Selleck v. Globe Int'l* (1985) 166 Cal. App. 3d 1123, 1131 (*Selleck*).)

10

### III. *YouTube's Community Guideline Tips Do Not Support A Claim Of Libel Per Quod*

Bartholomew's main argument on appeal is that the Community Guideline Tips internet page was defamatory and that the trial court's reliance on the fact that it only listed examples of conduct which might result in a video being removed and its reliance on the fact that the page did not mention her by name were erroneous. We are not persuaded.

As described above, Bartholomew alleges that, at the URL dedicated to her video, YouTube placed the statement that " '[t]his video has been removed because its content violated YouTube's Terms of Service.' " The hyperlink embedded in the statement leads the viewer to the Community Guideline Tips page which reads: "Want a little more insight into the limits and exceptions in the Community Guideline? Here are helpful examples and tips." Then follows the list summarized above, including "Sex and Nudity," "Hate Speech," Shocking and Disgusting," Dangerous Illegal Acts," "Children," Copyright," "Privacy," "Harassment," "Impersonation," and "Threats." Bartholomew alleges that each of these words, standing alone, is defamatory, but that they are also "particularly defamatory because of the manner in which YouTube defines those categories of conduct for the public." (See fn. 4, *ante*.)

Some of these statements, if they were sufficiently directed at Bartholomew, could unquestionably constitute libel per se. "Perhaps the clearest example of libel per se is an accusation of crime." (*Barnes-Hind*, *supra,* 181 Cal.App.3d at p. 385.) But we believe the central problem with Bartholomew's analysis is her failure to allege how the hyperlink would be viewed as defaming her personally.

Bartholomew argues that hyperlinks function as the modern equivalent of a footnote and that, because the removal statement contained a hyperlink to the Community Guideline Tip page, then the contents of that page were naturally attributed to her.

11

Quoting a federal case from the Southern District of New York, Bartholomew states that "[h]yperlinks have long been understood to be critical to communication because they facilitate access to information. They provide visitors on one Web site a way to navigate internally referenced words, phrases, arguments, and ideas." (*Adelson v. Harris* (S.D.N.Y. 2013) 973 F.Supp.2d 467, 484; quoting Dalal, *Protecting Hyperlinks and Preserving First Amendment Value on the Internet* (2011) 13 U.Pa. J. Const. L. 1017, 1019].)

This may be—but hyperlinks are used in so many different ways that it is practically impossible to describe their impact in any general way and the effect of each should be judged according to its own context.[7] They can be used, for example, to refer the viewer to more *specific* information about the subject being discussed on the originating page. (See, e.g., *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 19 [unsatisfied plastic surgery patient using hyperlinks to photographs of "*Before and After Photos*" of a surgery].) But, as here, a hyperlink can also be used to provide access to a webpage with information more *general* and *less specific* than was available on the originating page.

We believe an Internet user with a reasonable working knowledge of the how internet hyperlinks work would have understood that the list on the Community Guideline Tips page is in fact general—that no one particular offense could be reasonably read to apply to *Bartholomew's* video and that the categories applied to the many thousands of videos that YouTube might have had to remove for any number of reasons.

---

[7] For example, a link can be used to create an enforceable contract. (See, e.g., *E.K.D. v. Facebook, Inc.* (S.D. Ill. 2012) 885 F.Supp.2d 894, 901-902 [enforcing forum selection clause contained in terms of service accessible by means of a conspicuous hyperlink].) And a recent spate of cases have had to determine whether a hyperlink to an allegedly defamatory article can constitute a republication of those articles for the purposes of libel law. (See, e.g., *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.* (S.D. Cal., Mar. 7, 2007) 2007 U.S. Dist. LEXIS 16356, *23 [applying California law and finding that plaintiff had failed to come forward with significant, probative evidence of such a republication within the limitations period applicable].)

A contrary reading leads to two main problems for Bartholomew's complaint: first, Bartholomew does not adequately allege any particular defamatory meaning or false statement of fact and second, she does not adequately allege that any defamatory statement actually concerned her (i.e., that *she* was defamed).

Bartholomew asserts in her complaint, for example, that "*all* of the examples given of an alleged violation of the Terms of Service reflect adversely on Plaintiff's character." (Emphasis added.) But it is the very breadth of the contents of Community Guideline Tips that make this reading implausible. Bartholomew does not argue in any of her briefs, for example, that anyone would reasonably have believed that she had posted a video "incit[ing] hatred or violence against people of a particular nationality" (as described under "Hate Speech") or that she had strung "together unrelated and gruesome clips of animals being slaughtered" (under "Shocking and Disgusting") or that someone would have reasonably believed that she was posting "videos that train terrorists" or to instruct viewers on "bomb making" (as described under "Dangerous Illegal Acts.") Bartholomew also ignores other sections of the Community Guidelines above the Tips section (which she seems to concede can easily be accessed from the Community Guideline Tips hyperlink by simply scrolling upward) such as posting "repetitive content."

All of this, we believe, is fatal to Bartholomew's claim because she fails to persuade us that the Community Guideline Tips page has "an essential element of libel" which is "a *false statement of fact"* about the plaintiff. (*Selleck, supra,* 166 Cal.App.3d at p. 1133 [italics added].). "[T]he determinative question [for a libel claim] is whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance. [Citations.]" (*Ringler Associates Inc. v. Maryland Casualty Co*. (2000) 80 Cal. App. 4th 1165, 1181-1182.) After reviewing her complaint and her arguments on appeal, we are left wondering what "gist or sting" Bartholomew is even claiming wronged her.

13

To shore up this weakness, Bartholomew resorts to a legal doctrine normally used in statutory construction and contract interpretation, *ejusdem generis.* As her complaint alleges, "[p]ursuant to the doctrine of *ejusdem generis,* any individual alleged violations of the Terms of Service concerning content would be assumed by a reasonable person to be of the same offensive nature. See Cal. Civ. Code § 3534." As she argues, "[c]ommon practice and legal doctrine both hold that when an illustrative list of violations is provided, all other violations must be similar in kind to the examples listed. In law, this is the doctrine of *ejusdem generis.*"

As we have discussed, applying a legal doctrine like this seems to be contrary to the rule that the publication in question " 'is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.' [Citation.]" (*MacLeod, supra,* 52 Cal.2d at p. 551.) In any event, the Latin phrase *ejusdem generis* (meaning of the same kind or of the same class) stands for the proposition that " ' "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." ' " (*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1461.)

Even if we were to apply the doctrine to this case (and Bartholomew has pointed us to no libel case where it had been applied ), we see no unifying general nature or principle that links all of the bad acts listed by YouTube on its Community Guideline Tips page. This conduct ranges from posting a video which inadvertently includes someone who does not want to be filmed, to racist or sexist hate speech, to videos intended to incite violence, to inadvertently violating another person's copyright. There is here, then, no general class of conduct upon which *ejusdem generis* would or could be based. (See, e.g., *Ali v. Federal Bureau of Prisons* (2008) 552 U.S. 214, 225 [rejecting

14

application of *ejusdem generis* where it was "not apparent what common attribute connects the specific items"].)

Moreover, the use of *ejusdem generis* would raise a question as to how, if this case were to proceed to a trial, a jury would conduct its task. Would Bartholomew ask the jury to determine if YouTube defamed her under a common attribute uniting all of the categories listed on the Community Guideline Tip page? What would that even mean, given the disparate acts that are listed as potential violations of YouTube's guidelines? Bartholomew does not pose—and so does not answer—that crucial question.

For libel *per quod*, which Bartholomew herself emphasizes is the cause of action at issue here, it is "necessary that the words should have been published concerning the plaintiff and should have been understood by at least one third person to have concerned him [or her]. [Citations.] 'Defamatory words to be actionable must refer to some ascertained or ascertainable person, and that person must be plaintiff [citations]. If the words used really contain no reflection upon any particular individual, no averment can make them defamatory. It is not necessary that plaintiff should be mentioned by name if the words used in describing the person meant, can be shown to have referred to him and to have been so understood [citation].' [Citation]." (*Vedovi v. Watson & Taylor* (1930) 104 Cal. App. 80, 83.) "'It is the office of the inducement to narrate the extrinsic circumstances which, coupled with the language published, affect its construction and render it actionable, where, standing alone and not thus explained, the language would appear either not to concern the plaintiff, or, if concerning him, not to affect him injuriously. [Citation]." (*Id.* at p. 85.)

Bartholomew has provided no theory as to how the generalized statements on the Community Guideline Tips page were ever ascribed in any particular way *to her*. Instead, she goes in the other direction, asserting that YouTube should not "generically defame people like [herself]." But generic defamation presents fundamental legal

15

problems under California law. "If the group is small and its members easily ascertainable, [the] plaintiff[] may succeed. But where the group is large—in general, any group numbering over twenty-five members—the courts in California and other states have consistently held that plaintiffs cannot show that the statements were 'of and concerning them,' [Citations.]" (*Blatty v. New York Times Co*. (1986) 42 Cal.3d 1033, 1046.)[8]

Nor do we believe that by linking Bartholomew's URL to the Community Guideline Tips that YouTube has made the statements of and concerning her. As we have discussed above, the sheer breadth of topics covered by these tips simply cannot be reasonably read to apply to Bartholomew. "In pleading a case of libel *per quod* the plaintiff cannot assume that the court has access to the reader's special knowledge of extrinsic facts but must specially plead and prove those facts. (*Barnes-Hind* [*supra*] 181 Cal.App.3d [at p.] 387; *see also Martin v. Sutter* (1922) 60 Cal.App.. 8, 13 [citation] [to establish a case for libel per quod, plaintiff must prove that the publisher of the words intended they should be understood as imputing wrongdoing or wrong conduct to plaintiff and that the words were understood in that fashion by those who read them].)" (*Palm Springs Tennis Club v. Rangel* (1999) 73 Cal.App.4th 1, 7, fn. omitted.) Because the Community Guideline Tips cannot reasonably be understood as imputing any particular wrongdoing to Bartholomew (and she has identified none), we find no error in the trial court's ruling in this respect.[9]

---

[8] Bartholomew places emphasis, in urging us to reverse the trial court, on a statement from our Supreme Court to the effect that "whether or not [an] article is reasonably susceptible of [a defamatory] interpretation is a question for the court." (*MacLeod, supra,* 52 Cal.2d at p. 546.) The statement at issue in *MacLeod,* however, accused a *particular* individual of being a Communist and did not involve a long list of generalities as do the Community Guideline Tips. (*Id.* at p. 543.)

[9] To the extent that the two federal cases upon which Bartholomew relies come to a different conclusion, we respectfully disagree. We do note, however, that in one of

# IV. *The Removal Statement Is Not Defamatory On Its Face*

Bartholomew also argues that, even without recourse to the Community Guideline Tips subsection, the removal statement itself is defamatory.[10]  Again, the statement reads simply as follows:  "This video has been removed because its content violated YouTube's Terms of Service."  Bartholomew concedes that an accusation of a breach of contract is usually not defamatory in itself but that violating YouTube's terms of service is not analogous to a run-of-the mill breach of contract accusation because YouTube's terms of service are only violated when someone has "Cross[ed] the Line" or "abuse[d]" the Web site.

The terms of service, however, are attached to the complaint.  They consist of very fine print, are single-spaced, and are over three pages in length.  And though they incorporate the Community Guidelines, they also incorporate a privacy policy from Google.  They also include such requirements as allowing YouTube to update the user's "YouTube Uploader," (¶ 4.G), and prohibit such things as using YouTube for commercial purposes without prior written consent (¶ 4.D).   Several courts have found that a statement alleging a breach of contract is not defamatory per se, which must, to

---

those cases, the plaintiff was able to allege that it was associated with a specific wrongdoing, "inappropriate children's content." (*Song Fi, Inc. v. Google, Inc.* (N.D. Cal. Apr. 4, 2016) 2016 U.S. Dist. LEXIS 45547, *8-9.)  We also note that while the court in that decision clearly disagreed with the trial court's conclusion in this case, it did not discuss at length what defamatory meaning among the long list of topics covered by the Community Guideline Tips could be reasonably ascribed to the particular plaintiff in that case. (*Id.* at *30.)  And we note that, in the other federal decision relied upon by Bartholomew, the only decision cited to us ended up dismissing the defamation action because of a failure to plead that the words had a particular meaning, or innuendo. (See *Darnaa, LLC v. Google, Inc.* (N.D. Cal. Dec. 2, 2015) 2015 U.S. Dist. LEXIS 161791, *31.)

[10]  YouTube asserts that Bartholomew did not raise this issue below.  Because it involves a pure question of law, we will consider it.

17

state a claim for defamation, be supported by innuendo. (See *Emde v. San Joaquin County Cent. Labor Council* (1943) 23 Cal.2d 146, 159-160 ["The only remaining statement subject to challenge is that the dairy violated its contract with the union. Again, the question of violation of contract is a legal conclusion, but, by innuendo, the respondents have pleaded that the publication was intended to convey the charge that the respondents were dishonest. An innuendo, however, cannot ascribe a meaning to assertedly defamatory matter other or broader than the words themselves naturally bear; it cannot add to, enlarge, or change the sense of the published words"]; *Vedovi v. Watson & Taylor, supra,* 104 Cal.App. at pp. 84-85 [where notice stating that an insurance policy was cancelled for non-payment of premiums contained nothing that would expose plaintiff "to hatred, contempt, ridicule or obloquy, or . . . cause[] him to be shunned or avoided or . . . [have] a tendency to injure him in his occupation, it was obvious that the notice [wa]s not libelous *per se*"].)

Indeed, the point is made in a case Bartholomew herself cites to us as authority. In that case, the plaintiff claimed that he had been defamed because of a statement that his telephone service had been disconnected due to nonpayment. The court rejected the contention, noting that "[t]here is no implication that plaintiffs failed to pay their obligations from dishonest motives or from a desire to defraud their creditor. Absent some allegation that plaintiffs were engaged in a vocation where credit is an important asset and necessary for the proper conduct of their business, the instant communication in a legal sense would not expose plaintiffs to public contempt or ridicule, not tend to degrade them in society." (*Gautier v. General Tel. Co*. (1965) 234 Cal.App.2d 302, 309.)

Given the sheer breadth of the items covered in YouTube's terms of service, and even taking into consideration Bartholomew's profession, we do not think that the removal statement can be deemed to subject her to "hatred, contempt, ridicule, or

18

obloquy, or [cause her] to be shunned or avoided" or tend  to "injure [her] in [her] occupation."  (§ 45.)[11]

## DISPOSITION

The trial court is directed to enter, nunc pro tunc as of August 5, 2015, a judgment of dismissal.  That judgment is affirmed.  Costs on appeal are awarded to YouTube.

---

[11] Because we find that Bartholomew has alleged no defamatory meaning, we need not address the remaining issues she raises, including whether her allegation of special damages is adequate.  In addition, with regard to the relevant allegations discussed above, Bartholomew has offered no specific way in which she can amend her complaint to cure the defects.  Therefore, the trial court's sustaining of YouTube's demurrer without leave to amend will not be disturbed.  (See *Palm Springs Tennis Club v. Rangel* , *supra,* 73 Cal.App.4th at pp. 7-8.)

_____
                    RUSHING, P.J.


WE CONCUR:




_____
        GROVER, J.









_____
        WALSH, J.[*]






***Bartholomew v. YouTube, LLC.***
**H042775**

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOYCE BARTHOLOMEW,<br><br>　　　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>YOUTUBE, LLC,<br><br>　　　　Defendant and Respondent. | H042775<br>(Santa Clara County<br>Super. Ct. No. 1-15-CV275833)<br><br>ORDER CERTIFIYING OPINION<br>FOR PUBLICATION |

THE COURT:

　　The opinion in the above-entitled matter filed on November 2, 2017, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


Dated:


_____
　　　　GROVER, ACTING P.J.


_____
　　　　　　WALSH, J.[*]


---

[*]　Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.:  1-15-CV275833 |
| | |
| Trial Judge: | The Honorable Joseph Huber |

| | |
|---|---|
| Attorneys for Plaintiff and Appellant<br>Joyce Bartholomew: | Law Offices of Charles S. LiMandri<br><br>Charles S. LiMandri<br>Jeffrey M. Trissell<br>Teresa L. Mendoza<br><br>The Gumprecht Law Firm<br><br>Michale E. Gumprecht |
| | |
| Attorneys for Defendant and Respondent<br>YouTube, LLC.: | Wilson Sonsini Goodrich & Rosati<br><br>David H. Kramer<br>Michael R. Petrocelli<br>Sara E. Rowe<br>Brian M. Willen |

*Bartholomew v. YouTube, LLC.*
**H042775**