Filed 1/6/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSEPH BALLA, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> BRIAN HALL, <br><br>     Defendant and Appellant. | D074804 <br><br><br> (San Diego Super. Ct. <br> No. 37-2017-00040822-CU-DF-CTL) |
| LESA HEEBNER et al., <br><br>     Plaintiffs and Respondents, <br><br>     v. <br><br> BRIAN HALL, <br><br>     Defendant and Appellant. | (San Diego Super. Ct. <br> No. 37-2017-00015622-CU-DF-CTL) |

APPEAL from orders of the Superior Court of San Diego County, Joan R. Lewis, Judge. Affirmed in part, reversed in part, and remanded with directions.

Law Offices of David C. Beavans and John T. Sylvester for Defendant and Appellant.

Niddrie Addams Fuller Singh, David A. Niddrie; Schwartz Semerdjian Cauley & Moot, Dick A. Semerdjian and Alison K. Adelman; and Keith H. Rutman for Plaintiffs and Respondents.

Defendant Edward Siegel was an unsuccessful candidate for the Solana Beach City Council in 2016. During and after the City Council campaign, Siegel's campaign manager, defendant Brian Hall, sent a letter to the editor, distributed e-mails to local government and media, and posted Facebook messages about City Council members Lesa Heebner and Mike Nichols, and their relationship with local developer Joseph Balla (with Heebner and Nichols collectively, plaintiffs). Primarily using a fictional persona he created, "Andrew Jones," Hall asserted or implied that Heebner and Nichols lobbied for the North County Transit District (NCTD) to select Balla for a Solana Beach train station project in exchange for Balla giving them design work on the project and directing a charitable donation to a nature conservancy they supported. Siegel and Hall also ran a campaign advertisement implying that Heebner endorsed Siegel in the City Council race using a favorable quote from a 2007 Certificate of Appreciation signed by Heebner and given to Siegel by the City for his volunteer work.

Plaintiffs sued for defamation based on the publications, and Heebner claimed false light invasion of privacy based on the advertisement. Hall filed special motions to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute.[1] Siegel agreed not to file anti-SLAPP motions in exchange for relief from default; when he tried to file notices of joinder to Hall's motions, the trial court rejected them. The court permitted plaintiffs to conduct discovery on actual malice, and then denied the anti-SLAPP motions.

---

[1] Unless noted, further statutory references are to the Code of Civil Procedure.

Hall appeals, contending the trial court erred by denying his motions, denying Siegel's joinder, and permitting discovery. In essence, his position is that his publications were political opinions about a conflict of interest and not actionable. We disagree. Although political speech is appropriately accorded wide latitude, especially in election campaigns, calculated or reckless falsehoods can still amount to defamation even in that context. The record reflects that at the time of the publications, Hall knew or at least consciously disregarded the fact that Heebner and Nichols had no role in the NCTD selection process and the NCTD had no agreement with Balla. An agreement was not authorized until months later, and even then it was only an agreement to conduct further negotiations. Plaintiffs also suggested other ways in which the publications were knowingly or recklessly false. We reach a different conclusion as to the false light claim, as Heebner did not show the advertisement was defamatory per se or introduce evidence of special damages. Finally, we affirm the joinder and discovery rulings.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Parties and the NCTD*

Heebner owned a residential kitchen design business until 2007, and served on City Council from 2004 to 2016. She was later appointed to fill a vacancy in 2018. Nichols is a landscape architect who was a member of the City Council from 2006 to 2018. Each used Gerri Retman, a common friend, as a campaign manager.

Balla owns Strategic Assets Group, Inc. and works in real estate finance and development. He also managed property for George and Betty Harbaugh. The Harbaughs had a family trust, with their estate plan providing for a charitable trust, the George and Betty Harbaugh Charitable Foundation (Foundation). Betty died in 2008. In 2011, the estate plan was

3

amended to make Balla successor trustee after George's death. After George died in 2012, Balla became trustee and director of the Foundation.

Siegel is a psychiatrist and musician who ran for City Council in the November 2016 election. Hall is a real estate broker who served as his campaign manager. Hall created "fake people" Andrew Jones and his wife Lillian Rearden as pseudonyms. He set up e-mail addresses for both (using "Jones Consulting" in at least one e-mail signature for Jones), as well as a Facebook page for Jones with a stock photograph.

NCTD plans and operates public transportation in northern San Diego County, and owns the Solana Beach Transit Station (train station) and surrounding land. The NCTD Board of Directors (NCTD Board) has nine seats, representing various local governments in the region. Nichols held the Solana Beach seat on the NCTD Board in 2016, with Heebner as alternate. Jewel Edson held the seat in 2017, with Nichols as alternate.

B.     *Events Prior to the Publications*

After Balla became successor trustee of the Harbaugh family trust, he began the process of transferring assets to the Foundation as provided for in the estate planning documents. In 2013, the Foundation committed a $1.15 million donation to San Elijo Lagoon Conservancy to secure certain land in Solana Beach. The land was renamed "Harbaugh Seaside Trails," and dedicated for public use as open space and trails.[2]

Between late 2014 and mid-2015, the NCTD commenced a Request for Proposal (RFP) to develop the land around the train station. At Step One, the NCTD Source Selection Committee (the Selection Committee) evaluates

---

[2]     Plaintiffs' brief states the Foundation "donated" in 2014, but Balla's declaration says it "committed" to a donation in 2013. We rely on the declaration.

4

proposals. At Step Two, the Selection Committee holds discussions with and ranks short-listed proposers. At Step Three, the Committee negotiates with the highest ranked proposer, but can bring in additional proposers. It then makes a recommendation to the NCTD Board. At Step Four, the NCTD Board can authorize its executive director to enter an Exclusive Negotiating Agreement (ENA), which provides a developer exclusive rights to negotiate a Development Agreement. A developer "has no rights" to the site until the parties execute a Development Agreement and the NCTD Board and Federal Transit Administration approve it. The City would also have to approve any proposed development. The RFP states no NCTD officer or agent shall participate in contract selection if they have an interest in the selected firm.

Four proposals were submitted. Of relevance here, Balla worked with John DeWald, the principal of RhodesMoore, LLC, on a proposal called "Cedros Market." One of the other proposals was from Michael Dieden at Creative Housing Associates and was called "The Cove." In October 2016 the Selection Committee issued its final report. It ranked RhodesMoore first and Creative Housing Associates second. Hall e-mailed Siegel on October 25, indicating he and Dieden "met several times via the Solana Beach Chamber"; they "discussed working together with the sales of the development" and, in his "opinion, and many others, he was the most qualified."

Meanwhile, at a meeting of the San Diego County Democratic Party Central Committee in August 2016, Heebner spoke in support of City Council candidates Jewel Edson and Judy Hegenaur; she also said Siegel was "not electable." Hall, who was at the meeting, sent Siegel multiple text messages that evening. He reported that Heebner "badmouthed" Siegel and stated, "We need a Lisa [*sic*] retaliation. I had to walk outside and she bashed you for 10 mins. They then endorsed Jewel and Judy." In late October, Heebner

sent an e-mail to community members and a letter to voters. In both, she stated she did "not believe [Siegel] ha[d] the temperament or judgment to hold this office." In the e-mail she also offered her opinion that he was "not a serious candidate."

C. *Challenged Publications and Surrounding Communications*

1. *First Publication: October 27, 2016 Letter to the Editor*

Hall and Siegel wrote a letter to the editor for The Coast News, a local newspaper.[3] Siegel was the listed author. The letter ran on October 27, 2016, identified Siegel as a candidate for City Council, and stated in part:

> "Rumors have surfaced that Lesa Heebner resigned from the Solana Beach City Council to take the design jobs for the redevelopment project from her 'friend' developer. Rumors have also surfaced that (Mike) Nichols will not seek re-election to do the landscaping. I and many others find it particularly odd that a less qualified person, with little experience, and no contractor's license beat-out a very well-respected developer who was going to transform the train tracks into 'The Cove.' This was a backdoor deal, many people know this, and it is not right. . . . [¶] . . . [¶] Solana Beach deserves better than shady business on the train tracks."[4]

---

[3] When referring to actions taken by Hall as Jones or Rearden, we use "Hall/Jones" or "Hall/Rearden." In addition, we recognize Siegel may disagree as to how much he participated in the publications or messages (even suggesting at deposition Hall may have written some that appeared to come from him). Siegel is not a party to this appeal, and we draw no conclusions as to the level of his involvement.

[4] Hall/Jones states here and in other publications that Balla had no contractor's license, which Balla has acknowledged. We retain the references for context, as Hall uses "unlicensed contractor" to refer to Balla.

2. *Second Publication: October 28, 2016 E-mail*

On October 28, Hall/Jones sent an e-mail to the NCTD Board with a link to Siegel's letter to the editor, stating:

> "It is especially troubling to see Mike Nichols, a member of the [NCTD Board], capable of having a vote in the Solana Beach Train Station Redevelopment Project. This is only troubling since many residents of Solana Beach believe Nichols and Councilmember Lesa Heebner have a financial interest in the proposal that was accepted. NCTD has been widely criticized by local Solana Beach residents for picking an unqualified candidate, who does not have a contractor's license or experience, over a well-respected developer. This was a back door deal."

Hall also sent developer Dieden an e-mail with a link to the letter. The next day, Matthew Tucker, NCTD's executive director, responded to Hall/Jones. He stated that "no action has been taken by the Board to consider or approve a developer for this project" and indicated they would respond formally the following week.

3. *Third Publication: October 29, 2016 "All Roads" E-mail*

Around 12:30 a.m. on October 29, Siegel sent Hall a text message saying he was "getting interested in Balla" and it "[s]eems he's trustee of the Harbaugh Foundation." Just before 9:00 a.m., he sent another message, stating, "Maybe Harbaugh and Zito for the hit piece?" David Zito was running for re-election to City Council. At 7:00 p.m., Hall/Jones e-mailed local government officials, including NCTD Board members, and journalists with the subject line "All roads lead to Harbaugh/ NCTD Conflict of Interest" ("All Roads" e-mail). It stated, in part:

7

"Joe transferred the estate to himself in the formation of the [Foundation]. . . . [Joe] has no contractor's license . . . . [¶] Who can explain why NCTD would hire . . . an unlicensed contractor . . . to take on a multi-million dollar project? All roads lead to Harbaugh. The [Foundation] and Strategic Assets Group share the same address . . . . It is Lesa Heebner and Mike Nichols who lobbied for this imposturous proposal to be accepted. Neither Heebner nor Nichols are seeking reelection. Heebner will be designing the kitchens in the Cedros Market Development and Nichols will be doing the landscaping. Joe Balla did a back door deal with Lesa Heebner and Mike Nichols. . . . [¶] It is worth noting that Balla was in foreclosure in 2012. The [Foundation] was founded on 12-17-2012. George Harbaugh died on 12-17-2012. We might now conjecture that George died with a pen in his hand and with Balla putting his hand to the paper. (Maybe it was even done after the fact). [¶] In 2015, Balla made a $1M donation from his newly retained [Foundation] fund to save the 'Harbaugh Trails' and bought himself a train ticket to conduct the NCTD . . . [p]roject. It is clear as day that a non-profit businessman donated $1M to secure a multi-million dollar project . . . . Balla is a fraud. This is a major conflict of interest. . . . If Cedros Market moves forward with NCTD, they will be hit with a class action lawsuit. . . ."

Hall/Jones also included website links and a timeline, which indicated, among other things, that Balla "received the . . . project" in 2016. A little after 9 p.m., Siegel sent Hall a text message stating, "Wow, that was fast! The seed has been planted, and hopefully it will shoot up like Chinese bamboo torture!" Shortly after, Siegel wrote, "Way to go! I will forever have a vivid memory of significant moments in the process of polishing your inspired narrative."

Some pertinent communications followed. On October 31, NCTD's Chief Procurement and Contract Administration Officer, Samuel Elmer, wrote to Hall/Jones. He stated the project was "within the negotiations phase

with the highest ranked proposer"; if successful, "staff would make a recommendation to the Board"; and "no date has been scheduled" for the Board to consider the project. He also stated any Board member representing Solana Beach "would likely be precluded" from voting on developer approval, as they "will likely be voting" on it for the City.

On November 6, Hall/Jones e-mailed a journalist at The Coast News with a response by RhodesMoore to Siegel's letter, and reiterated claims of wrongdoing by the three plaintiffs. He forwarded this e-mail to someone named Mary Jane Boyd, stating he understood she was "very connected around Solana Beach" and "might find this interesting." Hall/Jones then sent another e-mail to the journalist about a response by Nichols. He complained that Nichols, Heebner and Balla were "dragging my name through the mud," adding that "[f]ortunately my wife thinks it is kind of funny." He later acknowledged that by "wife" he meant the fictitious Lillian Rearden.

4. *Fourth Publication: November 13, 2016 E-mail*

On November 13, Hall/Jones again e-mailed journalists and government officials, including Tucker and others at NCTD. He claimed that "RhodesMoore, LLC has been a suspended entity by the Secretary of State ever since 2012," and included a link to the Secretary of State website. He then stated in part:

> "The NCTD is conducting back door deals. You have a [*sic*] unlicensed contractor . . . and suspended LLC leading a triple million dollar development project. If NCTD moves forward with this project there will be a class action lawsuit against the City of Solana Beach and NCTD."

Tucker responded that day, stating, "I want to assure you that there is no back door deal--in fact no deal has been reached with any of the proposers."

9

### 5. *Fifth Publication: November 15, 2016 E-mail*

On November 15, Hall/Jones replied to Tucker's November 13 e-mail, copying the government and media recipients. He reiterated RhodesMoore "is a suspended entity," and then stated in part:

> "It is unbelievable that you and Councilmember Nichols are expressing no concerns, are attempting to sweep this under the rug, and acting so cavalier that your developer doesn't have an active LLC, zero experience, and no contractor's license. This is a conflict of interest. Nichols and Heebner have lobbied for Joe Balla in return for personal incentives. If you hire Joe Balla, Strategic Assets Group, or RhodesMoore you may expect a lawsuit to follow. [¶] The citizens of Solana Beach deserve better than the shady business on the Solana Beach train tracks. If you are not part of the solution you are part of the problem. You are a major part of the problem enabling Mike Nichols, Lesa Heebner, and Joe Balla."

### 6. *Sixth Publication: Facebook Posts* (*Heebner and Nichols only*)

Hall/Jones made several posts in the Solana Beach Community Forum on Facebook between October 28 and November 8. After a post regarding the City's board appointment policy, he commented, "How can you defend these people? They are co-conspirators!" and included a picture of the NCTD Board alternate list with Heebner's name highlighted. In another post, he said, "are these candidates going to continue the shady business on the Solana Beach train tracks," including a link to the letter to the editor. He also submitted posts asking "why doesn't Heebner and Nichols come out and say she [*sic*] won't take any jobs after their terms [*sic*]" and calling them "phony criminals"; "shady crooks"; and, along with Zito, "slim-balls [*sic*]." A post from Zito followed, which noted NCTD had a Selection Committee and there were no City Council members on it. Finally, Hall/Jones posted, "Lesa claims she is going to make a living off selling . . . cookbooks and not take any back

door deals.  It is my believe [*sic*] that Lesa should write a book on cookin' the books at city hall."

7.     *Seventh Publication:  Campaign Advertisement* (*Heebner only*)

Finally, in early November Hall ran a campaign advertisement for Siegel in the Solana Beach Sun Newspaper.  It contained a photograph of Siegel next to the words "Vote for Ed"; the quoted statement, " 'Your time, energy and level of commitment have greatly enhanced the quality of life in the City of Solana Beach' ~ Lisa Heebner, Solana Beach Former Mayor"; the statement, "A special 'thank you' to Lesa Heebner"; and the statement, "Ed Siegel City Council 2016, www.VoteforEd.org."

D.     *Postpublication Events*

Siegel was not elected in the November 2016 City Council election.  A few months later, in February and March 2017, Hall and Siegel exchanged text messages regarding Nadia Tkachenko, an acquaintance of Hall who was objecting to probate of Harbaugh's estate.  Before a probate hearing in early March, they met with her and Candice Dodge, a mutual friend of Tkachenko and Hall.  Tkachenko and Dodge attended the hearing, at which the court approved the petition and distribution of assets to Balla as trustee.  Its order reflects that the court and parties conferred about issues raised by Tkachenko, but does not elaborate.  In late March, Hall sent Siegel a text message stating that Tkachenko was going to make a "complaint to the attorney general."  Hall addressed these matters at his deposition.

In April 2017, Hall/Rearden wrote a letter to NCTD's general counsel, which reiterated or expanded on Hall/Jones's claims about the train station project.  In May 2017, the NCTD Board agenda included a staff report supporting approval of the Committee's recommendation.  The report noted the "receipt of a complaint," and stated a "thorough investigation was

11

conducted" and the allegations were either "unsubstantiated" or not a violation of NCTD or state conflict of interest laws. In June 2017, the NCTD Board voted to approve the Selection Committee's recommendation and authorize an ENA with RhodesMoore. Solana Beach's representative, Edson, recused herself.

E.    *Procedural History*

In May 2017, Heebner and Nichols sued defendants for defamation based on the first six publications; Heebner also sued for false light invasion of privacy based on the campaign advertisement. They filed their operative first amended complaint in October 2017. The same month, Balla sued for defamation based on the first five publications.[5] The cases were assigned to the same department. Hall filed an anti-SLAPP motion in each case, stating in each notice of motion that he was moving to strike the complaint "in its entirety."

Defaults were entered against Siegel, which the parties agreed to set aside in exchange for him not filing anti-SLAPP motions. When he filed joinders to Hall's motions, the trial court rejected them.[6] Meanwhile, plaintiffs successfully moved to lift the anti-SLAPP discovery stay to obtain discovery on the issue of actual malice.

Hall filed amended anti-SLAPP motions, with substantially similar notices of motion. His memoranda addressed the individual publications and the elements of plaintiffs' claims.

---

[5]    Plaintiffs also sued Boyd and an individual named Sandy Parrish, but voluntarily dismissed them.

[6]    The minute order in the record was in Balla's case, but Heebner and Nichols' counsel was present, and we take notice on our own motion that the order was filed in both cases.

12

According to Hall's supporting declarations, Siegel asked him who Harbaugh was, and he agreed to find out. He said he learned, among other things, that Balla was not supposed to receive estate assets, the Foundation and his company had the same address, and after the Harbaugh Trails donation he was chosen to negotiate a valuable development project. He explained he reviewed the RFP responses, Balla was "in [his] opinion the least qualified," and DeWald had issues including litigation history. He stated that based on his "review of these public documents, [he] strongly believe[d] [Heebner and Nichols] wanted to obtain a donation for Harbaugh Trails and in exchange they granted [Balla] the right to exclusively negotiate the development project." He understood that the Heebner quote in the advertisement came from a 2007 appreciation certificate. Finally, he denied malicious intent.[7]

Plaintiffs separately filed opposing briefs and declarations. In Balla's declaration, he stated he learned after George's death that he was chosen as successor trustee and denied that any assets were transferred to him personally. He addressed the donation, explaining that the Harbaughs loved open space and nature, he wanted to memorialize them, and there was no quid pro quo deal. He denied considering Heebner or Nichols for kitchen or landscaping work, and indicated the RFP identified others for these tasks. He also responded to specific claims. For example, he denied he had been in foreclosure, explaining he went into default to obtain a loan modification on

_____

[7] Hall also addressed a Committee member, Gary Martin, who supposedly had a relationship with Balla and DeWald. He does not discuss Martin in the argument section of his opening brief and nowhere in his briefs explains the connection, if any, to Heebner and Nichols. We do not discuss him further.

one property and modified another loan notwithstanding a judicial foreclosure action. He provided a declaration from a real estate attorney confirming these events.

Balla provided other declarations as well. DeWald said he founded RhodesMoore in 2012, it was not suspended at the time of the proposal in 2015 or revised proposal in 2016, and to his knowledge, "any . . . suspension that may have appeared online" was due to government clerical error. He also responded to other assertions by Hall, including about the litigation. Stephen Toohill, who worked with the Harbaughs, described the disposition of the trust and property transfers to the Foundation. He did not believe Balla had any ownership in the properties. Kent Seton, retained by Balla to assist with the estate, stated the donation was "made to advance charitable purposes" and agreed Balla did not take possession of any trust assets.

In Heebner's declaration, she stated she "was never required to cast any vote on the train station project" as an NCTD Board alternate member, she would have "recused" herself if she had been, and if the matter was ever before City Council she "would be entitled to vote." She explained her decision not to run for reelection had nothing to do with the project; she never planned to do kitchen design for it; and she had not been in that business since 2007. She denied having any financial interest in common with Balla or lobbying on his behalf. Heebner said the advertisement quotation was from a 2007 Certificate of Appreciation to Siegel from the City. They were given to all outgoing volunteers; she signed certificates that year as then-mayor; and in Siegel's case, it was for service as "a member of the Public Arts Commission."

Nichols provided a declaration as well. He stated he resigned from City Council in 2018 for personal reasons. He further explained that when the

14

NCTD Board considered the ENA, he was the alternate member for Solana Beach and did not attend; Edson attended as primary member and recused herself, as he would have. Nichols denied discussing landscaping work for Balla's proposal, having any financial interest in common with him, or lobbying on his behalf.

With their opposition filings, plaintiffs also provided excerpts of deposition testimony; deposition exhibits, including the text messages; and other documents. We have already described the relevant documents. Here we discuss the pertinent deposition testimony.

Hall testified that the claims about Heebner and Nichols doing design work were based on rumors, and he was aware that a different landscape designer was listed in the RFP. He said he wanted the "right person" to get the project and thought Dieden was "probably the most qualif[ied]." He testified he did "extensive research" about the Foundation, including the websites linked in the "All Roads" e-mail. There were assets unaccounted for, and he believed Balla "financially abused" the estate. He denied LLC ownership was with the Foundation, based on his "review of title and tax records," but did not know if Balla was a member or nonmember manager of various LLCs. He also testified he helped Tkachenko and Dodge prepare for the probate hearing; Dodge said the probate judge advised them to report Balla to the Attorney General; and he helped with a letter to the Attorney General but did not know the status. He was aware Tkachenko sued the Harbaugh trust, and it was "fair" to say she "doesn't care much for Balla". He also noted Tkachenko or Dodge told him Harbaugh was supposed to give Tkachenko a condo, but she did not receive it.

Siegel testified he had no information to confirm that Heebner or Nichols would be doing design work, or that they lobbied for Balla. He also

15

had no information they did a "back-door deal," and had not seen foreclosure documents for Balla, stating Hall "shared" this with him. Siegel further complained about Ira Opper (husband of Gerri Retman, Heebner and Nichols's friend and campaign manager). According to Siegel, Opper said he would be Siegel's "nemesis." At the same time, Siegel felt that Opper's "wife and her friends" had "continued to marginalize him." He was also "shocked and hurt and dismayed" at Heebner's comments about him during the election. Siegel addressed Tkachenko, explaining he met her at a meeting in Hall's office with Dodge and others, the purpose of which was to get information about Harbaugh and Balla. Siegel also noted that Tkachenko said Harbaugh promised her a condo when he died, and that she felt betrayed.

In Hall's reply declarations, he stated that prior to the publications he undertook a "substantial investigation into the matters of the NCTD, the [City Council], and the related affairs" of plaintiffs. He said he began in Fall 2016; spent a "1000+ hours," including speaking to community members, online research, and public records searches; and was "so convinced" he gave his information to law enforcement and did not have it when litigation began. He said he then did "supplemental" research, which confirmed his "well-founded beliefs" from his earlier research.

After an initial hearing on Balla's motion to address exhibit issues, the trial court heard both anti-SLAPP motions in September 2018 and denied them in separate orders. As to Balla's motion, the court stated that although the parties "devote considerable time" to the publications, Hall's "notice of motion sought to strike the complaint 'in its entirety' and did not separately notice any specific language." As a result, the court determined, "if any portion of the complaint is actionable, the motion must be denied," citing

16

*Optional Capital Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP* (2017) 18 Cal.App.5th 95, 111, fn. 5 (*Optional Capital*).

The trial court found that Hall met his burden on the first prong, disagreeing with Balla that the "All Roads" e-mail was not a matter of public interest and stating he "essentially conceded" as to the other publications. The court explained that "[a]lthough there may be portions of [the "All Roads"] e-mail that when isolated would not be a matter of public interest, in context, the Court concludes that this communication concerned a matter of public interest – the train station project."

On the second prong, the trial court first found Balla was a limited public figure. It explained the statements "generally concern the [train station project] and the proposals submitted to the [NCTD]"; the issue was who should be awarded the contract; and this was a public controversy. The court noted that Balla's complaint stated he was " 'a known representative and public face of RhodesMoore,' " and that " 'impugning the actions or reputation of Rhodes Moore' " was tantamount to impugning his.

As a public figure, Balla had to show he could prove falsity and actual malice, and the trial court concluded he met his burden. Focusing on the "All Roads" e-mail, it found the "statement . . . that [Balla] transferred the estate to himself is capable of being proven false," citing the Toohill declaration. It also found the " 'backdoor deal' " claim was "essentially a statement that [Balla] was colluding with City Councilmembers to be improperly awarded a public contract," and the "evidence reflect[ed] that neither Heebner nor Nichols were capable of voting on who should be awarded the project." The court also rejected Hall's arguments that the claim "conflict of interest" could not be proven false here, or that prefatory language like "rumors have surfaced" rendered all of his statements nonactionable.

17

The trial court also found that Balla could establish actual malice. It explained that "[u]nlike a pseudonym where an individual may publish under a name other than their own true name, here Hall actually created people–'fake people'–through which a jury could find he pursued a campaign, at least in part, to defame the Plaintiffs." The court also cited, among other things, the text messages between Hall and Siegel before and after the "All Roads" e-mail, which it found "clearly suggest[ed] that in response to Siegel's request for a 'hit piece' regarding Harbaugh (i.e., Balla)[,]" Hall sent the "All Roads" e-mail.

Finally, the trial court found the defamation was libel per se. It explained statements implicating a person's " 'office, profession, trade or business' " without the need for explanation could be libelous per se; at least some of Hall's statements, including "back door deal," qualified; and special damages were not required.

As for Heebner and Nichols, the trial court also found that under *Optional Capital*, "if any portion of the complaint is actionable, the motion must be denied." At the first prong, the court found Hall met his burden. At the second, it found Heebner and Nichols conceded they were public figures, but met their higher burden. On falsity, the court engaged in a similar analysis of the "backdoor deal," "conflict of interest," and prefatory language, including finding that Heebner and Nichols were not capable of voting on the project. On actual malice, the court similarly focused on the Jones/Rearden personas and the text messages. Here, it cited Hall's text message about a "[Lesa] retaliation" after Heebner's comments at the Democratic meeting, stating "[t]his exchange could . . . support a finding that [they] engaged in a campaign to defame Heebner (and Nichols as well) for the opposition to

18

Siegel's campaign and support of other candidates."  The court again found defamation per se.

The trial court then found Heebner met her burden on her false light claim:

> "While the language in the ad . . . is an accurate statement of what was said in the Certificate of Appreciation, in context, the language was clearly included to convey that for the 2016 election Heebner supported Siegel's campaign. Considering the Defendants' conduct prior to [its] publication . . . , a trier of fact could conclude that the publishing of this advertisement conveying that Heebner supported Siegel's campaign when she clearly did not and Defendants knew she did not, was made with actual malice."

The court also found that a "reasonable person could find this advertisement – under the facts of this case – to be highly offensive."

The trial court granted Siegel's motion to consolidate the cases the next day.  Hall timely appealed from the anti-SLAPP orders.

DISCUSSION

A.    *Anti-SLAPP Principles and the Standard of Review*

The anti-SLAPP statute "authorizes defendants to file a special motion to strike '[a] cause of action against a person arising from' the petition or speech activities 'of that person . . . in connection with a public issue.'  (Code Civ. Proc., § 425.16, subd. (b)(1).)"  (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321.)  Such activities include writings made "in a place open to the public or in a public forum in connection with an issue of public interest" (§ 425.16, subd. (e)(3)) and "conduct in furtherance of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest."  (*Id.*, subd. (e)(4)).

19

"Resolution of an anti-SLAPP motion involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16.  [Citation.]  If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)  At the second step, the court's "inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.  [Citations.]  '[C]laims with the requisite minimal merit may proceed.' " (*Id.* at pp. 384-385.)

" 'We review de novo a ruling on a special motion to strike under section 425.16.  [Citation.]  Thus, we apply our independent judgment, both to the issue of whether the cause of action arises from a protected activity and whether the plaintiff has shown a probability of prevailing on the claim.' " (*South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 657.)  An appellant still bears the " 'burden of affirmatively demonstrating error.' "  (See *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 (*Pietak*).)

B.     *Scope of Hall's Anti-SLAPP Motion*

Hall contends the trial court erred by concluding it had to deny the anti-SLAPP motions if any portion of the complaints were actionable.  We agree.

In *Baral*, the California Supreme Court held that an anti-SLAPP motion could reach separate claims within a single pleaded cause of action, disapproving *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th

20

90 (*Mann*).  (*Baral, supra*, 1 Cal.5th at p. 396.)  *Mann* held that " 'once a plaintiff shows a probability of prevailing on any part of its claim,' " a court " 'need not parse the cause of action so as to leave only those portions it has determined have merit.' " (*Baral*, at p. 385, citing *Mann,* at p. 106.)  *Baral* opted for a different rule.

The Supreme Court acknowledged it had appeared to take differing approaches on this issue in *Taus v. Loftus* (2007) 40 Cal.4th 683 (*Taus*) and *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811 (*Oasis*).  (*Baral, supra*, 1 Cal.5th at p. 388.)  In *Taus*, the court had examined specific incidents in a defamation lawsuit, concluding the action could proceed as to one, but not others.  (*Baral*, at p. 389, citing *Taus*, at pp. 717-742.)  But in *Oasis*, the court reasoned that although the complaint alleged multiple acts of attorney wrongdoing, it was " 'sufficient to focus' on just one.' " (*Baral*, at pp. 390-391; quoting *Oasis*, at pp. 820-821.)  *Baral* explained that the difference "flow[ed] from the way the parties framed the issues."  (*Baral*, at p. 391.)  In *Taus*, the defendants addressed the "viability of claims arising from discrete allegations of wrongdoing," whereas in *Oasis*, they "sought to strike the *entire complaint* based on the assertion that the attorney defendant had breached no duty." (*Baral*, at p. 391.)  The Court limited *Oasis* to its facts, and confirmed that a "plaintiff must make the requisite showing as to each challenged claim that is based on allegations of protected activity."  (*Id.* at pp. 392.)

The trial court relied on a case called *Optional Capital* to find that "if any portion" of the complaint was actionable, the motion had to be denied.  There, a company sued its former law firm in connection with various legal matters.  (*Optional Capital, supra*, 18 Cal.App.5th at p. 106.)  In the firm's anti-SLAPP motion, it argued it was not counsel in two matters, and plaintiff

21

could not prevail in the third due to the litigation privilege. (*Ibid*.) The trial court granted the motion and the Court of Appeal affirmed, holding the litigation privilege defeated the claims. (*Id*. at p. 119.) In the footnote relied upon by the trial court, the appellate court defended its use of thrust/gravamen analysis at prong one; in doing so, it contended that a case rejecting this approach read *Baral* too broadly; *Baral* permitted striking either the entire complaint or subparts; and "[c]ritically . . . Defendants . . . moved to strike [the] entire complaint." (*Optional Capital*, at p. 111, fn. 5.)

*Optional Capital*, in our view, does not validate the trial court's approach. *Baral* makes clear that not only can an anti-SLAPP motion attack portions of causes of action, but also that whether it does so turns on how the issues are framed—not simply the text of the notice of motion. (*Baral*, *supra*, 1 Cal.5th at p. 391.) To the extent the *Optional Capital* footnote is not just dicta, the procedural posture of the case remains akin to *Oasis*; a single theory could—and did—defeat the entire complaint. Here, in contrast, Hall's supporting memoranda below addressed individual publications and elements; plaintiffs' briefing did as well; and the parties continue to frame the issues in this manner on appeal. We thus examine each publication, recognizing some issues will be common to some or all.

C.    *Prong One: Do Plaintiffs' Claims Arise From Protected Activity?*

Plaintiffs argue Hall did not meet his burden to show his publications involved protected activity. We conclude he did.[8]

---

[8]    Plaintiffs did not file a protective cross-appeal to challenge the prong one ruling, but "[a] prevailing party on an anti-SLAPP motion need not file a cross-appeal to preserve his disagreement with the trial court's reasoning." (*Klem v. Access Insurance, Inc.* (2017) 17 Cal.App.5th 595, 609.) We note they include under their "Prong One" heading arguments about both whether the publications involve a public issue (a prong one matter), and whether

At prong one, "the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063.) Hall's alleged liability arises from his publications in newspapers, over e-mail to local government and media, and on Facebook, which asserted or implied that Heebner and Nichols arranged for Balla to receive the train station project in exchange for favors. These publications are protected activity under the anti-SLAPP statute.

At least three publications were in public forums: the letter to the editor, the newspaper campaign advertisement, and the Facebook posts. (§ 425.16, subd. (e)(3)); *Nygard, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1039 [newspapers are public fora under anti-SLAPP]; *Jackson v. Mayweather* (2007) 10 Cal.App.5th 1240, 1252 (*Jackson*) [Facebook posts were made in public forum for anti-SLAPP purposes].) All of them concerned issues of public interest. (§ 425.16, subd. (e)(4).) A public issue includes "conduct that could directly affect a large number of people beyond the direct participants" and a "topic of widespread, public interest." (*Rivero v. American Federation of State, County and Municipal Employees, AFL–CIO* (2003) 105 Cal.App.4th 913, 924.) There must also be "some degree of closeness between the challenged statements and the asserted public interest." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132; *FilmOn.com Inc. v. Doubleverify, Inc.* (2019) 7 Cal.5th 133, 150 [statement cannot simply refer to issue, but must " 'contribute to the public debate' "].) Hall's publications related to the City Council election and/or the train

Balla was a public figure (a defamation issue, pertinent here at prong two). We address the former here, and the latter *post*.

station project, a major public development. (*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 273-274 (*Rosenaur*) [anti-SLAPP "applies to actions arising from statements made in political campaigns"]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [statements concerning how "large residential community would be governed" involved public interest; concept has been "broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity"]; *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 523 [acquisition and operation of hospitals was public issue].)

Plaintiffs' arguments do not compel a different result. First, they maintain that Hall's intent in attacking Balla was "not political," but was rather "to damage Balla's credibility with NCTD." They also suggest that any connection between Balla's estate work and politics "is so attenuated as to take the defamatory statement out of any possible connection to any issue of legitimate public interest." But anti-SLAPP protection requires a public issue, not necessarily a political one. (§ 425.16, subd. (e)(3), (4).) And the publications *did* have political implications, given that some related to the election and all involved the City Council and/or the NCTD.

We also reject plaintiffs' related arguments that estate matters are private, and the "only purported connection between Balla's handling of Harbaugh's Estate and the Train Station project arises from the stories *Hall made up*." They are not disputing that the publications concerned the train station project; they are disputing their veracity, rendering the cases they cite inapposite. (*Greco v. Greco* (2016) 2 Cal.App.5th 810, 824 [alleged wrongful taking from trusts and estate was private matter]; *Kettler v. Gould*

24

(2018) 22 Cal.App.5th 593, 603, 605 [complaint to professional organization about alleged elder abuse by financial planner was not a public issue].)

Second, plaintiffs focus on the "All Roads" e-mail, contending the trial court assumed a "defamatory statement need only tangentially relate to a matter of public interest." To the contrary, the court found the e-mail *did* concern a public issue—the train station project—despite isolated statements that touched on other subjects. We agree. Indeed, the central assertion was that Balla secured the project by making the donation from the Foundation. For similar reasons we reject plaintiffs' suggestion that the e-mail merely "referred" to the public issue, and find their cases distinguishable. (See, e.g., *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [anti-SLAPP did not apply in product liability case where complaint also addressed speech used to market product].)

Finally, plaintiffs contend Hall published the statements for financial gain, and "statements . . . for the 'purpose of furthering a business interest' " do not involve the public interest, citing *World Financial Group, Inc. v. HBW Insurance & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1572. That case found that statements for the "*sole* purpose" of furthering business interests were unprotected, and is accordingly inapposite. (*Id.* at p. 1572, italics added; *id.* at pp. 1564-1565, 1573 [trade secret case; statements were part of "competitor's pitch" to solicit employees and "motivated solely" by desire to increase sales ranks].) Plaintiffs do not establish that Hall's motive was solely financial. Although there is some evidence he supported Dieden's proposal and may have seen it as a business opportunity, there is

significantly more evidence that his statements were motivated by personal hostility to plaintiffs—as they argue elsewhere.[9]

D. *Prong Two: Plaintiffs' Likelihood of Success on the Merits*

We next consider whether Hall has demonstrated the trial court erred in concluding that plaintiffs could prevail on their various claims.

1. *Defamation*

a. *Overview*

Plaintiffs base their defamation claim on the first six publications. Defamation " 'involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage.' " (*Sonoma Media Investments, LLC v. Superior Court* (2019) 34 Cal.App.5th 24, 37.) Libel is a type of defamation based on written or depicted communication. (Civ. Code, § 45; *Jackson, supra,* 10 Cal.App.5th at pp. 1259-1260.) Public figures have the "burden of proving both that the challenged statement is false, and that [defendant] acted with ' "actual malice." ' " (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84 (*Christian Research*); see also *Sonoma Media*, at p. 37 [plaintiff has burden on falsity when statements involve "matters of public concern"].)

"A statement is defamatory when it tends 'directly to injure [a person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office . . . peculiarly requires, or by imputing something with reference to his office . . . that has a natural tendency to lessen its profits.' (Civ. Code, § 46, subd. 3.) Statements that contain such a charge directly, and without the need for explanatory

---

[9] Plaintiffs' claim that Hall admitted the main purpose of his statements was to "benefit [him] professionally" and "increase [his] business" relies on messages from Siegel, and is not persuasive.

26

matter, are libelous per se. [Citation.] A statement can also be libelous per se if . . . a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) If the false statement is not libelous per se, a plaintiff must prove special damages. (*Barnes–Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 382 (*Barnes-Hind*).)

b.   *Balla is a Limited Purpose Public Figure*

Plaintiffs contend the trial court erred in finding that Balla was a limited purpose public figure. An "all purpose" public figure has " 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' " (*Reader's Digest Ass'n v. Sup. Ct.* (1984) 37 Cal.3d 244, 253 (*Reader's Digest*).) A " 'limited purpose' " public figure is one who ' "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' " (*Id.* at pp. 253-254; *Copp v. Paxton* (1998) 45 Cal.App.4th 829, 845-846 (*Copp*) [enough to " 'attempt[] to thrust [oneself] into the public eye' " or " 'influence a public decision' "].)

The trial court rejected Balla's claim that the matters did not involve a public controversy and noted his allegation that he was a public representative of RhodesMoore. These findings are sound. The train station project is a public issue, as previously discussed, and selection of a developer for the project constitutes a public controversy. (See *Copp*, *supra*, 45 Cal.App.4th at p. 845 [" 'If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.' "].) Balla not only alleged he was a representative of one of the prospective developers, RhodesMoore, but also that he and DeWald presented

on it at public workshops and met with the Selection Committee. He thus "'voluntarily inject[ed] himself'" into the controversy. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 253; see e.g., *Greenbelt Cooperative Pub. Ass'n v. Bresler* (1970) 398 U.S. 6, 8-9 (*Greenbelt*) [developer who sought zoning variances for high-density housing "clearly fell within even the most restrictive definition of a 'public figure'"]; *Okun v. Superior Court* (1981) 29 Cal.3d 442, 447-448, 451 (*Okun*) [developer of large condominium project involving city land exchange was public figure].)

Plaintiffs' contrary arguments are not persuasive. First, they contend that Balla is a "private citizen who develops and manages commercial real estate," and one does not become a public figure by "advertising . . . wares" or being involved in something with "public attention." But Balla was not pursuing commercial development or merely involved in a notable situation; he was actively seeking a contract for a major *public* project. The cases plaintiffs cite are thus distinguishable. (*Vegod Corp. v. Am. Broad. Cos.* (1979) 25 Cal.3d 763, 769-770 [companies that conducted close-out sales for department store whose closure generated controversy were not themselves public figures]; *Wolston v. Reader's Digest Assn.* (1979) 443 U.S. 157, 159-161, 167 [plaintiff's failure to answer subpoena about spy activity and resulting publicity did not make her public figure for defamation claim involving book written years later about Soviet spies]; *Time, Inc. v. Firestone* (1976) 424 U.S. 448, 450, 454, fn. 3 [ex-wife of "scion of one of America's wealthier industrial families" was not limited public figure, even though divorce was highly publicized and she had press conferences during it].)

Second, plaintiffs contend that "'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure,'" citing *Wilson v. Cable News Network, Inc.* (2019)

7 Cal.5th 871, 902. There, the California Supreme Court rejected the defendant's attempt to rely on news stories generated by plaintiff's lawsuit to contend he was a public figure. Here, in contrast, Balla's role in the public controversy as a potential train station developer preceded his lawsuit.

Finally, and relatedly, plaintiffs dispute that Balla voluntarily injected himself into a public controversy, contending "the attack by Hall and Siegel on Balla had little to do with any public interest issue concerning the Train Station; rather, it was simply a personal vendetta and financial goal." The publications plainly did concern the train station project and selection of the developer, and Hall's personal motivations for publishing them do not impact the public figure analysis.

   c.    *Falsity*

Next, Hall argues that plaintiffs failed to meet their burden on falsity. We disagree, and conclude plaintiffs offered sufficient evidence to prove that each publication was false.

"Though mere opinions are generally not actionable," a "statement that implies a false assertion of fact is actionable." (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 (*Issa*); *McGarry*, *supra*, 154 Cal.App.4th at p. 112 [" '[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications' "].) " '[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance.' " (*Issa*, at p. 702; cf. *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486 ["rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action"].)

29

"The 'pertinent question' is whether a 'reasonable fact finder' could conclude that the statements 'as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure' plaintiff's reputation.' " (*Issa, supra,* 31 Cal.5th at p. 703.) "We apply a ' "totality of the circumstances" ' test to determine whether a statement is fact or opinion, and whether a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made." (*Ibid.*) Under this test, " ' "[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered." ' (Citation.) Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*Ibid.*)

We begin with the content of the publications. A provably false claim constitutes the gist of each: that Heebner and Nichols lobbied for Balla to receive the train station project in exchange for the donation to Harbaugh Trails and for work opportunities. It was this alleged arrangement that Hall referred to as a "backdoor deal" and a "conflict of interest."[10] And the record

---

[10] The October 27 letter to the editor indicated Balla "beat-out" another developer, Heebner and Nichols would leave City Council to work on his project, and this was a "backdoor deal." The October 28 e-mail to the NCTD Board indicated Nichols was a Board member "capable of having a vote" on the project, NCTD "pick[ed]" Balla, and this was a "backdoor deal." The "All Roads" e-mail said Balla "received" the project in 2016, "made a $1M donation" and "bought himself a train ticket," and this was a "conflict of interest"; it also stated Heebner and Nichols "lobbied" for Balla and "will be" working on the project. The November 13 e-mail now stated "NCTD is in negotiations" with Balla, but also that it was doing "back door deals," "had" an unlicensed contractor, and Heebner and Nichols "lobbied" for Balla (and suggested NCTD had a "conflict of interest" with Balla). The November 15 e-

30

contains evidence that this claim was not only false, but also basically impossible at the time given the NCTD RFP process.

During that process, the Selection Committee would recommend a developer, the NCTD Board would enter an ENA and try to reach a Development Agreement, and after other approvals the City Council would vote on it. When Hall published his statements in fall 2016, the process was still with the Selection Committee—meaning Heebner and Nichols had no opportunity to use their NCTD Board or City Council membership to advocate for Balla's project, much less vote for it. By the time the NCTD Board voted to authorize an ENA with RhodesMoore in June 2017, Heebner was no longer a member, Nichols held the alternate seat for Solana Beach and did not attend the vote, and Edson, who held the primary seat and did attend, recused herself. This is consistent with what Tucker and Elmer told Hall/Jones in fall 2016, that the Board had not yet chosen a developer and when it did come to a vote, the Solana Beach member would likely recuse.

Hall disputes that the "backdoor deal" he described was impossible, citing the ENA and Heebner's declaration. With respect to the ENA, the issue is whether it was false for Hall to claim in fall 2016 that Heebner and Nichols had lobbied for NCTD to select Balla in exchange for favors—not whether he could reach some kind of deal with NCTD at some point. (See *Rosenaur*, *supra*, 88 Cal.App.4th at p. 275 [plaintiff pursued initiative for zoning changes to property; evidence he had only two partners at the time

_____

mail, directed to Tucker, called Balla "your developer," claimed Heebner and Nichols "lobbied" for Balla in exchange for favors, and described the situation as a "conflict of interest." The Facebook posts cited the "the shady business on the . . . train tracks," asked why Heebner and Nichols did not "say she [*sic*] won't take any jobs after their terms [*sic*]," and linked to the letter to the editor.

could show campaign fliers alleging additional owners were false].) As for Heebner's declaration, Hall contends she stated that "both [she and Nichols] were capable of [voting] with the NCTD and she was entitled to do so with the City Council." But general capability was not the issue. She specifically said they would have recused themselves from an NCTD vote, as Edson did. NCTD Board votes on different subjects, or a potential future City Council vote, are not relevant to whether Hall's statements regarding the train station project were true at the time they were published.

There were other provably false statements as well. We address some, but not every detail; our focus remains on the gist of the publications. (*Issa*, *supra*, 31 Cal.App.5th at 702.) For example, plaintiffs denied in their declarations that Heebner and Nichols were going to work for Balla; Balla further stated that others were identified for this work in the RFP, as Hall acknowledged at deposition with respect to landscaping; and Hall conceded these claims were based on rumors (with Siegel indicating he had no information at all).

As to the "All Roads" e-mail, plaintiffs offered evidence to show that the claims that Balla transferred the Harbaugh estate to himself and was in foreclosure were false. Regardless of Balla's apparent use of the same office space for his commercial and nonprofit work, the Toohill and Seton declarations indicate that he did not personally receive estate assets. The declarations of Balla and his real estate attorney provide evidence he was never in foreclosure.[11] Finally, plaintiffs can utilize DeWald's declaration to

---

11 The parties dispute whether the "All Roads" statement about George dying "with a pen in his hand" is a false claim that Balla murdered Harbaugh. Plaintiffs can prove the gist of the e-mail is false, but a reasonable reader would view this particular statement as hyperbole

refute the assertion that RhodesMoore was suspended since 2012.  DeWald specifically stated that the company was not suspended when it submitted the RFP proposal and any apparent suspension was due to clerical error.

We now address the political context.  As this court previously recognized with respect to political advertising, we "must be vigilant to afford a wide berth to the free exchange of ideas, including those that challenge or criticize statements made or actions taken by candidates seeking elected office." (*Issa, supra*, 31 Cal.App.5th at 704; *ibid.* [" '[p]olitical and self expression lie at the very heart of the First Amendment' "]; *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 954 (*Beilenson*) ["[h]yperbole, distortion, invective, and tirades" are part of American politics]; *id.* at p. 955 ["to ensure the preservation of a citizen's right of free expression, we must allow wide latitude"].)

But characterizing speech as "political" does not automatically or entirely exempt it from liability for defamation.  "The [United States Supreme Court] has made clear . . . that even as to public officials, knowingly false statements of fact are constitutionally unprotected." (*People v. Stanistreet* (2002) 29 Cal.4th 497, 505; *Garrison v. Louisiana* (1964) 379 U.S. 64, 75 (*Garrison*) ["That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. . . . Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas' "].)  Claims of criminal activity and personal dishonesty also may not be protected.  (Cf. *Okun, supra,* 29 Cal.3d at p. 451

_____

intended to imply that Balla was unethical.  (See *Greenbelt, supra,* 398 U.S. at p. 14 [developer claimed articles describing his negotiation approach as blackmail imputed the crime to him; even "the most careless reader" would view this as hyperbole].)

[in context of labor dispute, "even sharp attacks on the character, motives, and moral qualifications" of public officers are protected "short of accusations of crime or personal dishonesty"].)

Here, Hall's publications asserted or implied that Heebner and Nichols used their positions to give Balla the train station project in exchange for favors, and he offered those favors to get the project, including making a donation from the Foundation he directed. Put simply, Hall claimed that all three plaintiffs misused their positions to their benefit, in a manner that did not and could not have happened. As our discussion of actual malice will shortly reflect, the evidence indicates that Hall was motivated by personal hostility to the plaintiffs and had little to no regard for the truth of the publications. We conclude there is more than sufficient evidence that they encompass calculated falsehoods and claims of personal dishonesty, and fall beyond the bounds of protection. (*Garrison*, *supra,* 379 U.S. at p. 75; *Okun*, *supra*, 29 Cal.3d at p. 451.)

Not surprisingly, Hall maintains that his publications were nonactionable political speech. He contends they represented his "voiced opinions" that he believed plaintiffs' "actions represented a 'major' conflict of interest, 'shady business,' and a 'backdoor deal.' " We reject Hall's attempt to portray his publications as merely stating some vague opinion that Heebner and Nichols were corrupt politicians or that Balla was an unethical developer. He made repeated claims about specific actions supposedly taken by plaintiffs, which they can prove are false. The fact that he *also* refers to these events with terms like "backdoor deal" and "conflict of interest" does not shield him from liability. (See *McGarry*, *supra*, 154 Cal.App.4th at p. 112 [statement "couched as an opinion" can still actionable].)

34

For similar reasons, we reject Hall's reliance on *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434 to contend that each publication was merely "an allegation of a conflict of interest" and thus not defamatory. There, the gist of the statement *was* the conflict of interest claim. (*Id.* at pp. 444-445 [executive's opinion that reporter who participated in rate lawsuit had conflict of interest was not provably false; explaining a "conflict of interest involves . . . an application of an ethical standard to facts, reflecting the exercise of judgment"].) Here, "conflict of interest" is one of multiple ways Hall describes an alleged corrupt deal among plaintiffs, and those specific factual allegations can be proven false.

Hall offers several additional arguments, but none convince us to reach a different conclusion. First, he contends "prefatory language permeates" the allegedly defamatory statements. But many statements lacked prefatory language (e.g. the "All Roads" e-mail assertions that Heebner and Nichols "lobbied" for Balla's proposal and "will be" working on it) and, again, characterizing an assertion as an opinion does not automatically shield the author from liability. (*McGarry*, *supra*, 154 Cal.App.4th at p. 112; see *Cianci v. New Times Publishing Co.* (2d Cir. 1980) 639 F.2d 54, 64 ["It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think' "].)[12]

---

[12] The cases he cites here predate the Supreme Court's clarification that opinion is not exempt from defamation (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18), and are also distinguishable. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260–265 [critic's statement about his "impression" of what television producer told his writer was "merely a colorful illustration of what . . . might have gone on behind studio doors"]; *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 599, 603 [company statements during wage dispute that union leaders were "apparently" eager to prevent employees from getting payments and motivated by internal

Second, Hall contends that courts "frequently find . . . name calling, exaggeration, and ridicule to be nonactionable speech."  But the insults used by Hall (e.g. "a fraud") were in reference to the specific deal he alleged existed among plaintiffs; they were not the gist of his statements.  (Compare *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 347 [" 'liar' " could be defamatory, if "taken to refer to something dishonorable that transpired in the business . . . dealings" at issue] with, e.g., *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [describing attorney as " 'Kmart Johnnie Cochran' " in connection with lawsuit was an "expression of contempt"; phrase like "loser wannabe lawyer" was "classic rhetorical hyperbole"]; *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 12 [description of attorney tactic as "sleazy" and other statements were rhetoric].)

Finally, Hall argues that " 'online blogs and message boards are places where readers expect to see strongly worded opinions rather than objective facts.' "  But even were we to accept the premise, online speech can still be defamatory.  Only the Facebook posts would appear to constitute speech of that type here, and Hall took steps to lend special credence to his claims by creating the Jones persona and reiterating his assertions in multiple publications.  (See *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 429 [fact that speech is "broadcast across the Internet by an anonymous speaker does not ipso facto make it nonactionable opinion"].)  Indeed, Tucker

politics were nonactionable; gist was leaders would sacrifice member's interests for their ambitions, which was "not of a factual nature"].)

and Elmer took the e-mails seriously enough that they responded *three* times to clarify that the Board had not made a deal with a developer yet.[13]

> d. *Actual Malice*

Hall contends that plaintiffs failed to provide clear and convincing evidence of actual malice. The record is to the contrary.

To prove actual malice, a plaintiff must show that statements were made with " 'knowledge that [they were] false or with reckless disregard of whether [they were] false or not.' " (*Reader's Digest, supra*, 37 Cal.3d at pp. 256-257.) " 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth,' " and the evidence must be clear and convincing. (*Id.* at pp. 252, 256; see *Copp, supra*, 45 Cal.App.4th at p. 846 ["burden of proof by clear and convincing evidence 'requires a finding of high probability'; must 'leave no substantial doubt' "].)

"[A]ctual malice can be proved by circumstantial evidence." (*Reader's Digest, supra*, 37 Cal.3d at p. 257.) Considerations such as "anger and

---

[13]    Hall raises more points on reply, such as the dubious assertion that the claim Balla "transferred" the estate to himself is too vague to be false. We do not consider most (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["[p]oints raised for the first time in a reply brief will ordinarily not be considered"]), but address two. First, Hall claims that plaintiffs select nine statements in their brief to allege falsity and, because they have the burden on falsity, must prove the falsity of these statements. We do not view this to be plaintiffs' position and, regardless, Hall has the burden here. (*Pietak, supra*, 90 Cal.App.4th at p. 610; cf. *Claudio v. Regents of Univ. of California* (2005) 134 Cal.App.4th 224, 230 [on an appeal from summary judgment, appellant has the burden even if he did not have it below].) Second, Hall claims that DeWald's statements on RhodesMoore's status are opinions for which he lacks foundation. Hall does not establish he made an objection below and we will not consider it for the first time on appeal. (*Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1268.)

hostility toward the plaintiff," "reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff," and "failure to investigate" may, "in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Id.* at p. 258.) Such evidence is relevant "to the extent that it reflects on the subjective attitude of the publisher," and failure to investigate, without more, generally is insufficient. (*Ibid.*)

We agree with the trial court that plaintiffs provided sufficient proof from which a trier of fact, applying the clear and convincing evidence standard, could find that defendants acted with actual malice.

First, the text messages provide compelling evidence that Hall was motivated by hostility and lacked regard for the truth of his publications. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257.) Like the trial court, we find especially telling Hall's message after Heebner's comments at the Democratic Committee meeting that they "need[ed] a Lisa [*sic*] retaliation." His sending of the "All Roads" e-mail after Siegel expressed an interest in Balla and suggested Harbaugh for a hit piece, and Siegel's later messages about "polishing [Hall's] inspired narrative," similarly support a vengeance motive. There is other evidence of animosity too. For example, Hall confirmed at deposition that he wanted Dieden to get the deal, and admitted he assisted in Tkachenko's claims against the Harbaugh estate and an Attorney General letter regarding Balla. And Siegel, for whom Hall was working, testified at deposition that he was hurt by Heebner and felt marginalized by her friends.[14]

---

[14] Plaintiffs also direct us to messages and documents from 2017 in which defendants reference each other's roles in the publications and their alleged aims. Plaintiffs meet their burden without these materials, and we leave it

Hall argues actual malice is not satisfied through ill will alone. And it is certainly true that actual malice in this context requires "reckless disregard for the truth," and not "merely . . . ill will or 'malice' in the ordinary sense of the term." (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 667 (*Harte-Hanks*).) But hostility is relevant if it reflects on the publisher's attitude toward the truth of the statements (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257), and it does so here.

Second, the record reflects that Hall disregarded reliable sources and appeared to rely on unreliable ones. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257.) He did not seem to take seriously the clarifying communications from NCTD officials Tucker and Elmer after the October 28 e-mail, the October 29 "All Roads" e-mail, or the November 13 e-mail explaining that the Board had not selected a developer. Instead, Hall accused Tucker of being "part of the problem." He and Siegel would later seek information from Tkachenko, whom he knew did not like Balla and felt Harbaugh owed her something, and he apparently believed her close friend Dodge's report that the probate judge told them to report Balla to the Attorney General.

Third, Hall's use of the fictional Jones would support a finding of actual malice. We are not persuaded by his claim that he used Jones to express political opinions, for which he cites the "respected tradition of anonymity" in political causes. (*McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 343). His publications go well beyond opinion, as we have already discussed.

---

to the trier of fact to consider their relevance. We do note plaintiffs' claim that "Siegel later admitted he and Hall had no evidence of wrongdoing by Balla and were 'probably talking more about feelings than facts,'" relies on another message from Siegel in 2017, appears to concern tension between them (at a time when they were confronting the looming prospect of litigation), and does not seem to be an admission of anything.

And he did not simply use an alias, but rather created an identity, with a Facebook page, stock photo, and a wife. One could conclude he was trying to convey that the publications were from a real person unafraid to use his name—allowing him to persuasively, but safely, disseminate known or potential falsehoods. (Compare *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696-697 [that most electronic bulletin board users stayed anonymous was "cue to discount their statements"].) Further, he does not explain why he used the fictional wife Rearden to write to the NCTD, casting further doubt on his claim that he was just trying to hide his identity. The tradition of anonymity does not aid him. (See *McIntyre*, at pp. 336, 342-343, 357 [law prohibiting anonymous political literature was unconstitutional; citing pseudonyms in Federalist Papers and stating anonymity permits publication without prejudgment, persecution, or retaliation].)

Finally, any investigation by Hall was inadequate, and with the other evidence provides further proof of actual malice. We reject his claim that the evidence necessarily shows he did "vigorous[] research[]" and "vehemently believed" his publications." (See *Reader's Digest, supra,* 37 Cal.3d at p. 257 ["[p]rofessions of good faith" not persuasive where story is fabricated].) Even if it were true that Hall no longer had prepublication research because he gave it to law enforcement, he fails to identify relevant post-litigation evidence to support his central claim. For example, he cites "public documents" as grounds for his purported belief that Heebner and Nichols wanted the Harbaugh Trails donation, and gave Balla the ENA in exchange. The ENA was not authorized until June 2017 and they had no role in doing so; Hall does not identify any documents that could support such a belief in fall 2016. (See *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 393 (*Burrill*), distinguished on other grounds in *Baral* [defendant cited "no source" for

40

claim plaintiff "fabricated domestic violence allegations" and took "money to influence her child custody recommendations"; he "simply says so" and jury could conclude charges were "product of his imagination"]. Further, Siegel admitted at deposition he had no evidence of a backdoor deal (suggesting Hall never had any either). Finally, Hall gave deposition testimony calling into question his investigation into other statements as well, such as his admission that the RFP specifically identified a landscape designer other than Nichols.[15]

Hall contends that failure to investigate is insufficient for actual malice. We agree that the "failure to conduct a thorough and objective investigation, standing alone" is not enough. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 258.) But the evidence here goes well beyond mere lack of investigation, and includes Hall's disregard of contradictory input from Tucker and Elmer. (See *Harte-Hanks*, *supra*, 491 U.S. at p. 692 ["purposeful avoidance of the truth" distinguishable from failure to investigate; newspaper failed to interview key witness who might have confirmed statement was false]; *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 276 [accord]*; Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1048-1051 [actual malice shown where official failed to investigate statement that predecessor destroyed office files; evidence showed he had information about them being left].) The cases that Hall cites involve defendants who, unlike him, had at least some evidence to support their central claims. (See *Beilenson*, *supra*, 44

_____

[15]     Plaintiffs also question other evidence supposedly relied upon by Hall. For example, he produced a map of Solana Beach from Nichols's website with markings for the train station and other areas, but Nichols stated in a declaration that the image did not exist until he redesigned the website in 2017.

Cal.App.4th at pp. 947, 951-952 [actual malice not shown for campaign mailer alleging candidate was unethical for having law practice while employed by state where, among other things, there was conflicting evidence as to whether quoted witness authorized statement]; *Christian Research, supra,* 148 Cal.App.4th at pp. 77, 85 [employee's claim that institute was focus of federal investigation, based on supposed report from post office employee, insufficient for actual malice; there was no direct evidence employee fabricated report and no "obvious reason[]" to doubt it].)

      e.    *Libel Per Se*

Hall contends in his opening brief that plaintiffs did not establish the publications were libel per se because their trial court opposition papers supposedly asserted libel per se without evidentiary support. This argument also lacks merit.

Statements constitute libel per se when "a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter." (*McGarry, supra,* 154 Cal.App.4th at p. 112.) Courts have viewed "false statements . . . tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct [to be] defamatory per se." (*Burrill, supra*, 217 Cal.App.4th at p. 383; see *Barnes–Hind*, *supra,* 181 Cal.App.3d at p. 385 [false accusations of " 'questionable business methods' " are libel per se].) Whether a statement is "reasonably susceptible of [a defamatory per se] interpretation is a question for the court"; whether it "was so understood is a question for the jury." (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546.)

Hall does not demonstrate error by focusing on plaintiffs' trial court briefs. Courts "consider the pleadings, and supporting and opposing

affidavits" in assessing anti-SLAPP motions (§ 425.16, subd. (b)(2))—not simply the materials expressly identified in the parties' briefs. Further, our review is de novo, and " 'entails an independent review of the entire record.' " (*De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 856 (*De Havilland*.)

We also reject Hall's related contention that there was no evidence "even a single reader" understood the publications as making factual representations. To the extent he is suggesting defamation per se *requires* such evidence, he provides no authority in his opening brief for this claim, and the *De Havilland* case he cites on reply does not support it. (*De Havilland*, *supra*, 21 Cal.App.5th at pp. 865-866 [confirming issue of whether docudrama could be viewed as defamatory was "matter of law"; noting plaintiff must offer evidence, but concluding based on "actual docudrama itself" she could not prevail]; see also, cf., *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132-1133 (*Selleck*) [reversing dismissal of libel per se claim on demurrer; explaining article was "reasonably susceptible of a defamatory meaning on its face"].) And even if this kind of evidence were necessary, the communications from Tucker and Elmer would suffice.

Moreover, were we to focus on the substantive question of whether Hall's publications are susceptible of a defamatory per se meaning (which he does not address until his reply brief), we would conclude that they are. The core claim in each publication was that elected officials Heebner and Nichols arranged for a developer, Balla, to receive a contract for a public project in exchange for him giving them jobs on the project and directing a large charitable donation to a cause they supported. In essence, plaintiffs were accused of taking specific, improper actions while performing official and

43

professional duties.  Any reasonable reader would understand the publications to be asserting facts harmful to their reputations, without external information.  (See *Kramer v. Ferguson* (1964) 230 Cal.App.2d 237, 242-243 [letter stating City Council members used positions to affect trials, voted on issues in which they had financial interests, and were "dupes" of an individual whose identity could be presumed, as well as poster depicting them as puppets, were libel per se, noting "wide latitude" allowed in political disputes but finding they "clearly impute[d] dishonesty and corruption to the plaintiffs"]; *Silk v. Feldman* (2012) 208 Cal.App.4th 547, 551, 554-556 [letter asserting homeowner association official "used her position . . . to settle a lawsuit" in order to get free parking spaces alleged "serious breach of fiduciary duty" on "its face" and was "libelous per se"].)  Other provably false statements in the publications, such as the claim that Balla transferred estate assets to himself, bolstered this understanding.

We conclude the trial court properly denied Hall's anti-SLAPP motions as to plaintiffs' defamation claims, with respect to each of the six publications at issue.

### 2.    *False Light*

We reach a different conclusion with respect to Heebner's false light claim based on the campaign advertisement that quoted language from a nearly decade-old certificate of appreciation.  Although we agree with Heebner that the advertisement could be found to have placed her in a false light, we conclude she failed to introduce evidence sufficient to prove the advertisement was defamatory per se.  Because she also failed to offer evidence of special damages, this deficiency is fatal to her claim.

" 'False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly

44

offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.'" (*Jackson, supra,* 10 Cal.App.5th at p. 1264.) To establish a false light claim based on a defamatory publication, a plaintiff "must meet the same requirements" as for a defamation claim. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 277.)

Hall first contends the advertisement was true because Heebner actually made the quoted statement in the 2007 Certificate of Appreciation. But the trial court concluded that notwithstanding the literal accuracy of the quoted words, the use of language from the certificate was "included to convey" that Heebner "supported Siegel's campaign," impliedly finding that taking it out of context in this manner rendered it false. This reasoning is sound, and *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 499 is instructive. There, a psychoanalyst sued a magazine under California law for misquoting some passages from a recorded interview and omitting a portion of another. (*Id.* at p. 502.) The Court reversed summary judgment, explaining in pertinent part:

> "In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. . . . [Q]uotations add authority to the statement and credibility to the author's work. . . . [¶] A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because it attributes an untrue factual assertion to the speaker. . . . [¶] Second, regardless of the truth or falsity . . . , the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold." (*Id.* at p. 511.)

45

The Court concluded that a "material change" to the speaker's meaning could amount to a knowing falsehood. (*Id*. at p. 516.) Of particular relevance here, the Court noted that "an exact quotation out of context can distort meaning, although the speaker did use each reported word." (*Id*. at p. 515.)

Courts have applied these principles to statements that were taken out of context or otherwise misleading. (See, e.g., *Price v. Stossel* (9th Cir. 2010) 620 F.3d 992, 998, 1003 [reversing grant of anti-SLAPP motion for television program that used video of pastor describing a wealthy man; original context reflected he was using a hypothetical, but program suggested he meant himself]; *Issa, supra,* 31 Cal.App.5th at pp. 696-697, 709, 714 [applying *Masson* to television advertisements in congressional campaign; they did not materially alter the meaning of a referenced newspaper article about the congressman or his remarks from a hearing]; cf. *Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1432 (*HBCC*) [issuing writ of mandate in challenge to proposition pamphlet with misleading statement about company not paying " 'this tax' "; explaining a "literally true" statement "can still be materially misleading"].)[16]

Here, as in *Price*, and unlike in *Issa*, Hall's out-of-context use materially altered the statement's meaning and rendered it misleading. That statement ("Your time, energy and level of commitment have greatly enhanced the quality of life in the City of Solana Beach") was from a nearly decade-old appreciation certificate, signed by Heebner as mayor, which Siegel

---

[16] See also *Crane v. The Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1522 (article juxtaposing denials of corruption by two officials to sound contradictory could be viewed as materially altering their gist); *Block v. Tanenhaus* (5th Cir. 2017) 867 F.3d 585, 590 (newspaper subject to libel claim for taking professor's statement about slavery out of context).

received for serving as a volunteer on an arts commission. Hall then inserted the statement in Siegel's campaign advertisement in quotation marks, without referencing the certificate and adding, "A special 'thank you' to Lesa Heebner." The implication of including the quote was that Heebner supported Siegel, which was amplified by the omission of context and addition of the thanks. Knowing that Heebner did not support Siegel, one could fairly conclude that Hall materially altered Heebner's statement in a manner directly contrary to her public position.

Hall's arguments to the contrary are not persuasive. In his opening brief, he contended without authority that the statement was true and that Heebner cited no authority below for her position. But the burden here is on Hall and the case law, in any event, supports Heebner. On reply, he tries to distinguish *HBCC* by arguing the case expressed caution about hyperbole in political debate and Heebner did not identify a false statement. Even if we were to address this belated point, the attempt to distinguish *HBCC* fails; indeed, the case confirms that use of a technically accurate statement in campaign literature can still be materially misleading. (*HBCC*, *supra*, 94 Cal.App.4th at p. 1432.)

Second, Hall contends there was no actual malice because the statement was true and he never had serious doubts about it. As we previously explained, however, Hall's use of the statement could be viewed as materially altering its meaning. He also cannot reasonably deny he knew he was doing so, because he altered the meaning to suggest support for a person (Siegel) that Hall knew Heebner actively opposed. (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 256-257 [actual malice established through evidence of knowing falsehood].) Hall stated in his declaration that he understood the statement came from an appreciation certificate, and his messages to Siegel after the

Democratic Committee meeting reflect that he knew Heebner opposed his candidacy. And as we have already discussed, his call for a "Lisa [*sic*] retaliation" is further evidence of actual malice.

Finally, even if Heebner proved the advertisement created a false impression and that Hall acted with actual malice, to prevail on her claim Heebner would be required to prove that (1) the advertisement was defamatory per se, or (2) she suffered special damages. Here, we agree with Hall that Heebner failed to introduce sufficient evidence of either option, and thus did not meet her burden of establishing a likelihood of success on the merits of this particular claim.

The issue is not simply, as Hall suggests, that the publication involves an out-of-context statement. Defamation requires both falsity and injury to reputation; the defamation per se analysis focuses on the latter, and even if context is necessary to show falsity it might not be needed for reputational harm. (See *Barnes–Hind*, *supra*, 181 Cal.App.3d at p. 382 [with libel per se, " 'damage to . . . *reputation* is conclusively presumed" (italics added)]; see, e.g., *Selleck*, *supra*, 166 Cal.App.3d at p. 1132 [article purporting to quote " 'leading man' " actor Tom Selleck's father as saying he was " 'ill at ease with women' " and " 'not the person' " women thought was libelous per se].) But a harmful meaning must still be clear to constitute defamation per se. For readers to perceive the advertisement as harmful to Heebner's reputation, they would need to know, at a minimum, who Siegel was and something about his views and position within the Solana Beach community. In other words, understanding the defamatory meaning required outside context. The reader had to appreciate where on the local positive-negative spectrum Siegel fell.

Heebner's arguments to the contrary are not persuasive. First, she cites *Selleck*, but unlike Siegel, a leading television and movie actor and his reputation would be known to the average reader. Second, she argues that special damages generally do not need to be proven when the defendant intended to hurt the plaintiff's professional reputation, citing *De Havilland*, *supra*, 21 Cal.App.5th 845, *Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1474, and *Sunward Corp. v. Dun & Bradstreet, Inc.* (10th Cir. 1987) 811 F.2d 511, 535. But defamation per se turns on whether the defamatory meaning is clear; the portion of *De Havilland* discussing intent concerns actual malice; and the other cases are inapposite. (*De Havilland*, at pp. 869-870 [addressing actual malice; noting courts have required showing of intent where the "defamatory aspect . . . is implied"]; *Sommer*, at p. 1474 [statements about actress were "defamatory on their face" where they could subject her to professional harm or ridicule]; *Sunward*, at pp. 535-538 [finding statements regarding business defamatory per se under Colorado law].)[17]

The trial court erred by not granting Hall's motion as to Heebner's false light claim.

E.    *Siegel Joinder*

Hall contends the trial court erred by rejecting Siegel's joinder notices, and that we should determine whether the complaints should be stricken as to him. Some additional facts are helpful here. Plaintiffs initially filed requests for entry of default against Siegel. The parties then stipulated in each case to set aside the default, with Siegel "agree[ing] not to file an Anti-SLAPP motion in this case." The court signed orders on the stipulations, stating that Siegel "is not to file an Anti-SLAPP motion in this matter."

---

[17]    In light of our conclusion on the defamation per se issue, we need not address Hall's other arguments regarding the false light claim.

49

Siegel then filed notices of joinder to Hall's pending anti-SLAPP motions, which Balla sought to strike. At an ex parte hearing on the matter, which Heebner and Nichols' counsel attended, the court ruled that Siegel "is not allowed to file a joinder."

Even assuming we have jurisdiction to consider the issue and that Hall has standing to raise it—both of which plaintiffs dispute—Hall does not establish that the trial court erred. He contends codefendants may join anti-SLAPP motions, citing *Barak v. The Quisenberry Law Firm* (2006) 135 Cal.App.4th 654, 661 (*Barak*) and that Siegel's joinder requests "did not run afoul" of his agreement not to file anti-SLAPP motions. We disagree.

*Barak* does support joinder in certain situations. There, the plaintiff sued a law firm and its client for malicious prosecution. (*Barak, supra*, 135 Cal.App.4th at p. 656.) The firm filed an anti-SLAPP motion that the client joined, the trial court granted it, and the Court of Appeal affirmed. (*Id.* at pp. 660-662.) The court rejected the plaintiff's argument that the joinder was invalid, explaining that the claim "qualifie[d] for treatment under section 425.16" and the client sought affirmative relief. (*Barak*, at p. 661; see *ibid*. [distinguishing summary judgment, which requires evidence by moving defendant to trigger response by plaintiff].) But *Barak* does not support joinder here. Its reasoning turned on the fact that the client's joinder request was sufficient to invoke anti-SLAPP—that is, to have the same effect as an anti-SLAPP motion. (*Barak*, at p. 661.) Here, Siegel agreed *not* to file anti-SLAPP motions, and then tried to file joinders to achieve the same result. It is because they are equivalent that the trial court properly rejected them.

F.    *Discovery*

Finally, Hall argues the trial court abused its discretion by granting plaintiffs' motions to conduct limited discovery prior to the hearing on the

50

anti-SLAPP motion. We again begin with some additional facts. Following the filing of Hall's anti-SLAPP motion, Heebner and Nichols moved to lift the discovery stay, and Balla filed a similar motion. They argued good cause existed for discovery, as they could establish a prima facie case of defamation and the evidence they sought to discover was relevant to actual malice. Hall filed oppositions, disputing the publications were provably false and contending plaintiffs did not establish they could not get the evidence elsewhere. The trial judge granted Heebner and Nichols's motion, stating at the hearing, "I think when there's malice, some discovery needs to be done." She added that "plaintiff's discovery in a defamation suit is of prime importance and . . . the defendant will generally be the principal . . . source of evidence," subsequently observing, "[d]on't you think that there has to be some discovery as to who Andrew Jones was[?]" The order found that plaintiffs "demonstrated 'good cause' to conduct the subject discovery, including that this discovery goes to the element of malice." Hall filed a petition for writ of mandate with this court, arguing the trial court did not properly apply the good cause standard. We denied the petition, and the trial court granted Balla's similar motion the following month. The order found that Balla demonstrated good cause, noting that he "submitted sufficient evidence that the subject communications are provably false and that the information is not readily available from other sources."

As a general rule, discovery is stayed upon the filing of an anti-SLAPP motion. (§ 425.16, subd. (g).) But the trial court may still "for good cause shown, . . . order that specified discovery be conducted." (*Ibid.*; *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1189-1190.) In the anti-SLAPP context, "good cause" requires "a showing that the specified discovery is necessary for the plaintiff to oppose the [anti-SLAPP]

motion and is tailored to that end." (*Britts v. Superior Court* (2006) 145 Cal.App.4th 1112, 1125.) We review discovery rulings for abuse of discretion. (*Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 191 [in anti-SLAPP context, reviewing court "may not disturb the trial court's ruling" on request for specified discovery "absent an abuse of discretion"].)

Plaintiffs contend the issue is moot because discovery is over, while Hall argues we can strike the evidence and should consider the issue even if moot. The cases cited by Hall involve *successful* writ petitions challenging anti-SLAPP discovery. (See *Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342 and *Garment Workers Ctr. v. Sup. Ct.* (2004) 117 Cal.App.4th 1156 (*Garment Workers*).) He cites no authority to support striking anti-SLAPP evidence after the motion is granted. (*Cf. Garment Workers*, at p. 1163 [court could consider limited discovery, if and when it determined plaintiff could prevail on elements besides actual malice].)

Assuming the issue were not moot, we would find no abuse of discretion. Plaintiffs sought discovery on actual malice, which they must show to prove defamation as public figures. They also narrowly tailored their requests by seeking the depositions of Hall, Siegel, and a handful of others. The trial court reasonably found good cause for discovery, noting its importance in showing actual malice and that the defendant is generally a primary source of evidence. (See *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 868 [libel defendant "will generally be the principal, if not the only, source of evidence" as to whether he "knew the statement published was false," or published it "in reckless disregard of whether the matter was false and defamatory"].)

Hall disagrees, contending the trial court erred by allowing discovery before determining whether plaintiffs had established a prima face case of

falsity or if they could obtain the information elsewhere, citing *Paterno* and *Garment Workers*. But the court expressly or impliedly found that plaintiffs made this showing, as reflected in its hearing comments and orders. Moreover, the finding was sound. As we have already discussed, plaintiffs introduced sufficient evidence to prove falsity. And with regard to the additional requirement of actual malice, the discovery that the trial court permitted yielded evidence only defendants could have provided, such as the text messages and Hall's testimony about Andrew Jones.[18]

---

[18] The cases Hall cites are distinguishable. (See *Garment Workers*, *supra*, 117 Cal.App.4th at p. 1162 [defamation lawsuit by corporation against nonprofit groups; trial court abused discretion by permitting discovery where, among other things, there were "serious questions" about falsity]; *Paterno*, *supra*, 163 Cal.App.4th at p. 1351 & fn. 4 [publisher suing reporter did not establish prima facie case of falsity or show information was unavailable from other sources, such as the reporter's assistant].)

## DISPOSITION

The trial court's order denying Hall's anti-SLAPP motion against Heebner and Nichols is affirmed in part and reversed in part. The court shall vacate the order, and enter a new order (1) granting the anti-SLAPP motion on the Second Cause of Action (False Light); and (2) denying the anti-SLAPP motion on all other grounds. The order denying Hall's anti-SLAPP motion against Balla, and the joinder and discovery rulings as to both motions, are affirmed. Plaintiffs shall be awarded their costs on appeal.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.